# SESSIONS v. ROMADKA.

# ROMADKA v. SESSIONS.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF WISCONSIN.

Nos. 262, 263. Argued March 30, 31, 1892. — Decided April 25, 1892.

An assignee in bankruptcy is not bound to accept the title to a patent for an invention, vested in the bankrupt at the time of the bankruptcy, if, in his opinion, it is worthless, or may prove to be burdensome and unprofitable; and his neglect for a year, during which he winds up the estate, to assume the ownership of such property, and his statement to a person desiring to purchase it that he has no power to do anything with it and that the bankrupt is the only one who can give title, are convincing proof of an election not to accept it.

It does not lie in the mouth of an alleged infringer of a patent to set up the right of an assignee in bankruptcy to the patent as against a title acquired from the bankrupt with the consent of the assignee.

Section 4917 of the Revised Statutes, which provides for disclaimers "whenever, through inadvertence, accident, or mistake, and without any fraudulent or deceptive intention, a patentee has claimed more than that of which he was the original or first inventor or discoverer," and allows the patentee to "make disclaimer of such parts of the thing patented as he shall not choose to claim or hold by virtue of the patent or assignment, stating therein the extent of his interest in such patent," is broad enough to cover disclaimers made to avoid the effect of having included in a patent more devices than can properly be made the subject of a single patent.

The power of a patentee to disclaim is a beneficial power, and ought not to be denied except when resorted to for a fraudulent and deceptive purpose.

The effect of delay by a patentee to make a disclaimer under Rev. Stat. § 4917 until after the commencement of an action for the infringement of his patent goes only to the recovery of costs.

Where the Revised Statutes adopt language of a previous statute which had been construed by this court, Congress must be considered as adopting that construction.

The invention patented by letters patent No. 128,925, issued July 9, 1872, to Charles A. Taylor for an improvement in trunks was novel and patentable; and the letters patent are infringed by the fasteners constructed in accordance with the descriptions in letters patent No. 145,817 dated December 23, 1873, and the improvements thereon described in letters

patent No. 163,828, dated April 10, 1875, both issued to Anthony V. Romadka.

The pioneer in an art, who discovers a principle which goes into almost universal use, is entitled to a liberal construction of his claim.

When a patented invention is infringed by its use upon another article of which it forms an inconsiderable part, taking the place of something previously serving the same uses, and there is no established royalty by which to measure the damages, they may be ascertained by finding the difference between the cost of the patented article and the cost of the article which it displaces; but this rule may be modified, if law and justice seem to require it.

When it is doubtful from the evidence whether the word "patented" could be affixed to a manufactured article, or whether a label should be attached with a notice of the patent, under the provisions of Rev. Stat. § 4900, the judgment of the patentees is entitled to weight in determining the question.

A defendant in a suit for the infringement of letters patent, who relies upon a want of knowledge on his part of the actual existence of the patent, should aver the same in his answer.

When an assignee in bankruptcy refuses to accept a transfer of a right of action existing in the bankrupt at the time of the bankruptcy, and abandons it to the bankrupt before the expiration of the time within which an assignee in bankruptcy could bring suit upon it, the right of action of the bankrupt and of a purchaser from him are governed by the general statute of limitations, and not by the rule prescribed for an assignee in bankruptcy.

THE court stated the case as follows:

This was a bill in equity by the appellant Sessions for the infringement of letters patent No. 128,925, issued July 9, 1872, to Charles A. Taylor, for an improvement in trunks.

The patent included several devices used in the manufacture of trunks. First, a yielding roller to be applied to the outside of the trunk; second, in spring catches to hold the trunk shut; third, in a brace of peculiar construction applied to the outside of the trunk for the purpose of holding up the lid; and, fourth, in a spring arm for supporting the tray when turned up. In the specification the patentee made the following statement with regard to the spring catch, which was the only feature of the invention claimed to have been infringed in this suit:

"Instead of providing the top of the trunk with the usual

straps for fastening it down, I attach to its front two spring catches, I, and to the top two tangs or plates, J, which lock into and are held by the catches. Each catch consists of a metal socket, *e*, provided with a hinged latch or hook, *f*, and with a flat spring, *g*, which bears against the lower end of the latch, and keeps its upper end pressed inward against the socket. The upper end of the latch or hook is provided with a prong, *i*, which extends through into the socket as shown in Fig. 4, the upper side of the prong being bevelled off, as shown. The tangs on the top or lid are provided with bevelled ends and with holes, or openings, as shown. When the top is pressed down, the tangs slide down into the sockets and the prongs, *i*, of the latches lock through them, in the manner shown in Fig. 4, so as to hold the top or lid down securely. In order to unlock latches it is only necessary to turn back the upper ends of the hooks or latches so as to draw the prongs out of the tangs. After the latches are turned back a certain distance the springs hold them in position, as shown in Fig. 1 and in dotted lines in Fig. 4, so that it is only necessary to attend to one of them at a time."

The only claim which was alleged to have been infringed was the third, which reads as follows:

"3. The spring catches, I, constructed and applied to the front of the body, as described, in combination with the tongues or hasps, J, on the top, when arranged to operate as set forth."

The answer denied the validity of the patent and infringement of the same. After the testimony had been taken, the plaintiff entered with the Commissioner of Patents a disclaimer of all the claims of the patent except the one in suit, and upon the hearing upon pleadings and proofs the court adjudged the patent to be valid, and that the defendants had infringed, and referred the case to a master to ascertain and report to the court the number of trunk fasteners made, used and sold by defendants, and the profits which they had received and which had accrued to them since December 12, 1874, from their infringement, together with all damages in excess of such profits sustained by plaintiff and his assignor since that date.

Subsequent to the entry of the interlocutory decree, which was opened for that purpose, and pending proceedings before the master, the defendants by leave of the court amended their answer by alleging that the title to the patent was in the assignee in bankruptcy of one Poinier, who assigned the patent to the plaintiff subsequent to his adjudication in bankruptcy. The bill was also amended by averring that the assignee never accepted title to the patent, but neglected and refused to assert any claim thereto, and that he is now estopped from claiming any title or exercising any dominion over such patent, or the invention thereby secured; and is also barred by the provisions of the bankruptcy act requiring suit to be brought within two years after the accruing of any cause of action. In his report, made under the order of the court, the master found that the testimony left no doubt that "at the date of the granting of the patent to Taylor the only known device for accomplishing the results produced by the trunk fastener was the ordinary trunk strap used in conjunction with the simple dowel pin. It seems, therefore, that the profits for which the defendants must account to complainant under the decree of this case are to be found by arriving at the cost of making and applying the strap and dowels and deducting therefrom the cost of making and applying the infringing trunk fastener manufactured and sold by the defendants."

Figuring upon this basis, the master found that the sum of $11,455.03 had been saved by the defendants by the manufacture and use of 2500 gross of fasteners admitted to have been made and used by them, over what it would have cost them to have made and applied the straps and dowels necessary and proper to have been used for the same purpose in lieu of such infringing fasteners. No computation was made of damages for the reason that the testimony showed that the profits allowed by him largely exceeded any actual damage sustained by the plaintiff. Exceptions were filed by both parties to this report, and a final decree was entered sustaining the exceptions filed by the defendants to the master's report, vacating and setting aside such report, and decreeing nominal damages

for the infringement.   21 Fed. Rep. 124.   Both parties appealed from this decree to this court.

*Mr. C. E. Mitchell* for Sessions.

*Mr. F. C. Winkler* (with whom was *Mr. J. G. Flanders* on the brief) for Romadka.

I.   Under the sweeping language of the Bankrupt Act, all the bankrupt's property, of every species, whether scheduled or not, passed to the assignee.   *Comegys* v. *Vasse*, 1 Pet. 193; *Milnor* v. *Metz*, 16 Pet. 221; *Clark* v. *Clark*, 17 How. 315; *Phelps* v. *McDonald*, 99 U. S. 298.   The transfer being by operation of law and by public record is *ipso facto* effective against any subsequent purchaser, though not recorded.   *Prime* v. *Brandon M'f'g Co.*, 16 Blatchford, 453.   The assignee can neither be required nor permitted by a speculative discretion to settle questions of ownership between himself and the bankrupt.   *Berry* v. *Gillis*, 17 N. H. 9; *S. C.* 43 Am. Dec. 584; *Hillary* v. *Morris*, 5 Carr. & Payne, 6; *Streeter* v. *Sumner*, 31 N. H. 542; *Mount* v. *Manhattan Co.*, 41 N. J. Eq. 211.

There can be no doubt that this patent right (and all rights under it) vested completely and absolutely in the assignee in bankruptcy.   *Morse* v. *Godfrey*, 3 Story, 364; *Phillips* v. *Helmbold*, 26 N. J. Eq. 202; *Wickersham* v. *Nicholson*, 14 S. & R. 118; *S. C.* 16 Am. Dec. 478; *Mays* v. *Manufacturers' Nat. Bank*, 64 Penn. St. 74; *Bank* v. *Sherman*, 101 U. S. 403. This suit, therefore, stands as if Henry W. Poinier, notwithstanding his bankruptcy, brought suit on the patent, seeking to recover on what he had assigned to his creditors.

It is claimed, however, that an assignee has the discretion to reject onerous or *unprofitable* assets and that in such case they revert to the bankrupt; and a line of cases, resting upon a line of English cases, is relied upon as supporting this contention.   We submit that this principle is subject to the following limitations.

*First.*   It is of course true that the assignee may fail to reduce specific property to his possession, and in that case the

party having possession will have his possessory title, which will be protected against the assaults of any mere trespasser. This is necessarily confined to corporeal property. It can have no application to a patent right. That passes at once by the assignment and requires, and can have, no act of reducing it to possession. There can be no adverse possession. Infringers may perhaps, to the extent of their infringement, hold a *quasi* adverse possession. This may, unless timely action is brought, protect them in the enjoyment of the fruits of their acts. But there is and can be no adverse possession of the right. It is not a "thing in possession."

*Secondly.* There are some things which, when assigned, impose upon the assignee who accepts the assignments the obligations of a covenantor, obligations which are enforceable, not against the property only by way of lien, but against the assignee personally, as against a promisor. The common instance of this is a lease. The assignee of a lease, by reason of privity of estate, becomes *personally* bound by its covenants. Hence it is held that an assignment in bankruptcy does not operate to vest this kind of property in the assignee, but that it vests only upon his express acceptance.

Subject to these two modifications, all property of the bankrupt, not exempted by statute, vests absolutely in the assignee. It is not sound that the assignee may say to the bankrupt, This thing, I think, is not worth much and I will let you keep it. The law vests it in the assignee without regard to value. The only case in which such a transaction can have any effect is where possessory rights accrue as a consequence. The supposed exception as to "unprofitable" property rests wholly upon English authority. It does not, therefore, exist except so far as it is recognized by English adjudications. A mere *dictum* or use of a word where the actual question is not involved cannot extend it.

No claim is made that the patent was ever reassigned to Poinier. He did not schedule it. The assignee never knew of its existence. The principle of our bankrupt law was: (1) To divest the bankrupt of all his property not exempt, and make it over absolutely to his creditors for the payment of his

debts; (2) To leave to the bankrupt all he might thereafter earn, and give him release from his old debts upon compliance with proper conditions.

The property transferred to the assignee he does not get back unless his debts are paid in full. An assignee may be discharged, or an assignee may die, but the trust remains while there is property unadministered and debts remain unpaid. "No principle," says Judge Story, "is more firmly established than that a trust will never fail for want of a trustee."

Hence we find that when long after estates in bankruptcy have apparently been closed assets are found to exist, the court will appoint a new trustee to take charge of and administer them. *Clark* v. *Clark*, 17 How. 315.

II. The patent is void on its face, for that it covers several distinct inventions, and this defect cannot be cured by disclaimer.

The Taylor patent of 1872 covers four entirely distinct inventions, in no way connected in design and consideration. The patent is therefore void. *Evans* v. *Eaton*, 3 Wheat. 506; *Barrett* v. *Hall*, 1 Mason, 447; *Moody* v. *Fiske*, 2 Mason, 112; *Wyeth* v. *Stone*, 1 Story, 273. The decision of the department, as well as of the courts, has been uniform that such diverse inventions cannot be united in one patent.

This patent was held void by the court below for this reason. *Sessions* v. *Romadka*, 21 Fed. Rep. 124; but the court held that the defect was within the remedial reach of a disclaimer. Thereupon, on the 30th of July, 1884, John H. Sessions, the complainant, filed a disclaimer of the first, second and fourth claims. All infringement had ceased a year before this disclaimer was filed.

It is true that if this patent could be saved by a disclaimer it saved the suit. But did it save damages which accrued before it was filed? Perhaps it did so far as they accrued to the party who files the disclaimer. But could it possibly save damages which accrued to the former owner, Poinier? He has not disclaimed. While he held the patent it was void. What claim for damages could he transfer to plaintiff in 1878?

If he transferred none, how can any subsequent act of Sessions create them?

III. The allowance of nominal damages only was correct. The burden of proof to show the defendants' profits is wholly on the complainant. *Garretson* v. *Clark*, 15 Blatchford, 70; *S. C.* on appeal, 111 U. S. 120; *Dobson* v. *Hartford Carpet Co.*, 114 U. S. 444; *Goulds' Man'g Co.* v. *Cowing*, 12 Blatchford, 243; *S. C.* 14 Blatchford, 315; *Ingersoll* v. *Musgrove*, 14 Blatchford, 541. Unless he furnishes the requisite evidence on every essential point, he can have nominal damages only. *Rude* v. *Westcott*, 130 U. S. 152. The mode adopted by the master furnished a false test.

And further, so far as the damages before the assignment by Poinier are concerned, the right to recover them never passed out of him.

IV. Section 4900 of the Revised Statutes provides that "it shall be the duty of all patentees, and their assigns . . . vending any patented article . . . to give sufficient notice to the public that the same is patented, either by fixing thereon the word 'patented,' together with the day and year the patent was granted, or when *from the character of the article this cannot be done*, by fixing to it or to the package wherein one or more of them is enclosed, a label containing the like notice, and in any suit for infringement by the party failing so to mark, no damages shall be recovered by the plaintiff, except on proof that the defendant was duly notified of the infringement and continued after such notice to make, use or vend the article so patented."

The complainant in this case was a large manufacturer and vendor of the patented article in question. Two specimens offered in evidence were sworn to by him as embodying the patent and to be of his manufacture. It was obvious to the court from their inspection that it could not be truthfully said of them that "from the character of the article" the affixing of the word "patented" with the date of the patent "could not be done." The complainant claimed in general terms that he had notified defendants by letter, but made no sufficient proof to that effect.

The statute is that no damages shall be recovered by the plaintiff " except on *proof* that the defendant *was duly notified of the infringement* and continued. *after such notice* to make, use or vend the article so patented."

Here is a notice to be given which is expected to be acted upon, and the non-action will involve substantial pecuniary consequences. We submit that such a notice must be given in writing; also, that a complainant who would rely upon it, in place of complying with the statute duty of marking his goods, should allege it and make satisfactory proof.

It is no answer to say that the defendants "doubtless" knew of the Taylor patent. That is not "being notified of the infringement." The rights enjoyed by complainant are great. They levy tribute on the whole country. They are a privilege. *But they are purely statutory.* Compliance with the statute is the condition precedent to their enjoyment. As the benefits conferred are great, it is but due that compliance with that condition should be insisted on. At best complainant would be entitled to damages only after notice given.

V. This was a mere claim for a tort to third persons. It passed to the assignee by the assignment. The assignee had to assert it by suit within two years after his appointment. When it passed back to the bankrupt by reason of the refusal of the assignee to take it, assuming such to be the case, it passed subject to the statute of limitations governing the assignee, and had to be asserted within the two years, which was not done.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

1. Defendants attack the title of the plaintiff to this patent upon the ground that Poinier, who bought the patent of Taylor in 1872, and subsequently, in 1878, sold it to Sessions, had, prior to such sale, and in September, 1876, been duly adjudicated a bankrupt in the District Court of the United States for the District of New Jersey, and an assignee appointed, in whom, it is claimed, the legal title to the patent

vested. It seems, however, that Poinier did not include this patent in his schedule of assets, upon the ground, as he said, of its being unproductive property and of no value. Indeed, all that he seems to have done with the patent was to make a lot of trunk fasteners in 1872, which proved to be failures, and which appear to have been the cause of his insolvency. He made no others for the three years before he went into bankruptcy. On May 15, 1877, he received his discharge, and on November 27 of the same year his assignee was discharged. On June 12, 1878, thirteen months after Poinier had received his discharge, and six months after his assignee had been discharged, Sessions bought a shop right of Poinier, for which he paid him $500, and in the same year purchased the patent itself, for which he paid him $1000 additional. Mr. Shepard, who acted as the agent of the plaintiff in making this purchase, testifies that he went to Newark on the morning of June 6, 1878, and inquired for Henry W. Poinier. "I was informed that one Mr. Miller was his assignee, and that I could learn of his affairs by seeing him. I then went to the office of Mr. Miller and found him there, introduced myself, and told him that I had come to see him about a patent for a trunk fastener which was owned by Henry W. Poinier, and under which said Poinier had been making trunk fasteners; and I asked Mr. Miller if he would sell me said patent, or give me a shop right thereunder, as the assignee of Mr. Poinier. Mr. Miller replied that he could not do so; that the estate was all settled up; he had made his return to the court, and had been discharged as assignee, and he had no power to do anything in the matter. I asked him what I could do, and he said the only thing was to go to Mr. Poinier; that Poinier was the only one who could give me any title. . . . I learned that Mr. Poinier was in Rochester." While the assignee does not recollect the conversation, there is nothing to disprove Mr. Sessions's version of it; nor is it strange that Miller did not recollect it, as he acted as assignee in some six or seven hundred cases, and could hardly be expected to remember all the transactions connected with them. It is undisputed that Shepard went to Newark to find Poinier, and subsequently went to

Rochester and found him there. The first assignment from Poinier was executed August 16, 1878, and conveyed only the title to the patent itself; but a second assignment, bearing date September 24, included also all rights of action for infringement from the date that Poinier himself acquired the title to it.

While, under the provisions of the bankrupt law, the title to this patent undoubtedly passed to the assignee in bankruptcy of Poinier, it passed subject to an election on his part not to accept it, if, in his opinion, it was worthless, or would prove to be burdensome and unprofitable. And he was entitled to a reasonable time to elect whether he would accept it or not. *American File Co.* v. *Garrett*, 110 U. S. 288, 295; *Sparhawk* v. *Yerkes*, 142 U. S. 1; *Amory* v. *Lawrence*, 3 Cliff. 523, 535.

In this case the assignee had taken a year to wind up the estate, and had given no sign of his wish to assume this property, if indeed he knew of its existence. On being asked with reference to it by the proposed purchaser, he replied that the estate was all settled up, that he had no power to do anything in the matter, and that Poinier was the only one who could give a title. A plainer election not to accept can hardly be imagined. Granting that up to that time he had known nothing about the patent, it was his duty to inquire into the matter if he had any thought of accepting it, and not to mislead the plaintiff's agent by referring him to the bankrupt as the proper person to apply to. Under the circumstances, plaintiff could do nothing but purchase of Poinier. Bearing in mind that no claim to this property is now made by the assignee, but that his alleged title to it is set up by a third person, who confessedly has no interest in it himself, it is entirely clear that the defendants ought not to prevail as against a purchaser who bought it of the bankrupt after the assignee had disclaimed any interest in it.

Had the existence of this patent been concealed by the bankrupt, or the assignee had discovered it subsequently — after his discharge — and desired to take possession of it for the benefit of the estate, it is possible the bankruptcy court

might reopen the case and vacate the discharge for that purpose. *Clark* v. *Clark*, 17 How. 315. But it does not lie in the mouth of an alleged infringer to set up the right of the assignee as against a title from the bankrupt acquired with the consent of such assignee. ·

It is quite evident from the facts stated that this patent, which seems to have been the cause of Poinier's insolvency, was thought to be of little or no value, that the assignee so regarded it, and that its real value was only discovered when the plaintiff had brought to bear upon the manufacture of the device his own skill and enterprise.

2. Defendants are charged with infringing the third claim of the Taylor patent, which was for a spring fastener, modifications of which are now in almost universal use, as a substitute for the old-fashioned strap and buckle. Upon the hearing in the court below, it was claimed the patent was invalid by reason of the joinder of distinct inventions in the same patent — inventions, which, though applicable to the same article, viz.: a trunk, do not co-operate in the use of such article. The court below was evidently inclined to this opinion, but permitted the plaintiff to enter a disclaimer of all the claims but the one in suit. Whether these different devices were properly embodied in the same patent or not, we think this was a proper case for a disclaimer under section 4917. While the language of this section provides for disclaimers "whenever, through inadvertence, accident or mistake, and without any fraudulent or deceptive intention, a patentee has claimed more than that of which he was the original or first inventor or discoverer," it allows the patentee to "make disclaimer of such parts of the thing patented as he shall not choose to claim or hold by virtue of the patent or assignment, stating therein the extent of his interest in such patent." We think this section broad enough to cover disclaimers made to avoid the effect of having included in the patent more devices than could properly be made the subject of a single patent. The power to disclaim is a beneficial one, and ought not to be denied except where it is resorted to for a fraudulent and deceptive purpose. In *Tuck* v. *Bramhill*, 6 Blatchford, 95, a disclaimer was allowed by

Mr. Justice Blatchford where two, or more inventions were covered by a single claim. In *Hailes* v. *Albany Stove Co.*, 123 U. S. 582, 587, it was said by Mr. Justice Bradley to be "usually and properly employed for the surrender of a separate claim in a patent, or some other distinct and separable matter, which can be exscinded without mutilating or changing what is left standing."

The only difficulty connected with the question of the disclaimer in this case arises from the final sentence of section 4917, that "no such disclaimer shall affect any action pending at the time of its being filed, except so far as may relate to the question of unreasonable neglect or delay in filing it." There is an unfortunate choice of language here which has rendered this sentence very ambiguous and difficult of construction. It was held by Mr. Justice Story in *Reed* v. *Cutter*, 1 Story, 590, 600, that, if the disclaimer were filed during the pendency of the suit, the plaintiff would not be entitled to the benefit thereof in that suit — a ruling which had also been made in *Wyeth* v. *Stone*, 1 Story, 273, 294. It was held in *Tuck* v. *Bramhill*, 6 Blatchford, 95, that the provision meant that a suit pending when a disclaimer is filed is not to be affected by such filing so as to prevent the plaintiff from recovering in it, unless it appears that the plaintiff unreasonably neglected or delayed to file the disclaimer. And such was also the ruling of Mr. Justice Nelson in *Guyon* v. *Serrell*, 1 Blatchford, 244; and in *Hall* v. *Wiles*, 2 Blatchford, 194, 198. We think that section 4917 ought to be read in connection with section 4922, providing that the patentee may maintain a suit at law or in equity for the infringement of any part of the thing patented, notwithstanding the specifications may embrace more than that of which the patentee was the first inventor or discoverer; but in every such case in which a judgment or decree shall be rendered for the plaintiff no costs shall be recovered, unless the proper disclaimer has been entered at the Patent Office before the commencement of the suit. This was practically the construction given to corresponding sections of the act of 1837 by this court in *Smith* v. *Nichols*, 21 Wall. 112; and of the Revised Statutes in *Dunbar*

v. *Myers*, 94 U. S. 187, 193. Under section 4922 the effect of delaying a disclaimer until after the commencement of the suit goes only to the recovery of costs. We adhere to that construction. Congress, having in the Revised Statutes adopted the language used in the act of 1837, must be considered to have adopted also the construction given by this court to this sentence, and made it a part of the enactment.

3. The essential feature of the Taylor patent consists of a plate attached to the body of the trunk, which contains a socket and hinged catch, and a double acting spring whose function is to hold the catch either open or shut, and a tang fastened to the lid, which, as the lid is closed, drops into the socket holding the catch, which, when closed, holds the lid firmly in place. It also acts as a dowel to keep the cover from racking.

Of the alleged anticipating devices the patent to Gaylord of 1861 is a trunk lock, not, as in this case, a fastener, designed to supplement the lock, and differing from the old-fashioned and well-known trunk lock principally in discarding the hinged hasp and using a rigid tang attached to the cover, which sinks into the socket in the body of the trunk prepared to receive it, and is there self-locked, but is unlocked only with an ordinary key. It was not designed at all to supersede the buckle and strap, but was only a substitute for, and an improvement upon, the ordinary lock. In short, it is a modification of the spring lock previously used upon trunks.

The Roulstone patent of 1866 is for an improvement in travelling bags, and shows a spring-locking device for securing the two parts of the bag firmly together. It has no features in common with the trunk fastener of Taylor, and is not adapted to hold the lid of a trunk firmly to the body. It has no means for holding the catch out of engagement when desired, and is wholly unlike the modern trunk fastener.

The patent to Semple of 1868 covers an angle plate upon the trunk cover, provided at the end side with a dowel in combination with a small plate upon the box, provided with a loop into which the dowel enters, and at the front side with a hasp and staple to be used with a padlock. The object was to

fasten and hold together the box and the cover of the trunk, but the means provided for accomplishing this are so different from those employed by Taylor that they can hardly be compared. Besides the device is evidently of no utility.

The patent to Cutter of 1868 was also for an improvement in trunk locks, especially adapted for security against an unauthorized opening of the trunk, and operated only by an independent and detachable key. It appears to be self-locking and does not differ materially from the ordinary spring lock. It is not a trunk fastener, as distinguished from a lock, and is not designed to be used as a substitute for the strap and buckle.

The patent to Locke of 1871 consists of straps made of hoop iron, steel or brass, or other metals which yield readily, their upper ends resting loosely in caps or escutcheons, so as to have a slight degree of lateral play, the lower ends being formed dovetailed and adapted to engage with catches attached to the body of the trunk. The lower end of the strap rides over the lugs of the catches until the cover is fully closed, when the inclines of the strap and the lugs coincide, and the straps then drop into place and remain locked. This device is undoubtedly a fastener, as distinguished from a lock, but it lacks the rigid tang, the hinged catch, the spring — in short, all the essential features of the Taylor invention.

The Hillebrand patent is also for a trunk lock, and, like the others, is operated by an independent key, and also lacks the features of the Taylor patent.

The Ransom patent is for a trunk fastener, consisting of two parts, one of which is attached to the body of the trunk and the other to the lid. It does not, however, contain the socket open at the top and designed to receive a rigid tang, nor does it contain the other mechanism of the Taylor patent. While intended to accomplish the same purpose, the means used are so different that it is far from being an anticipation

There are none of these patents which contain the peculiar combination of the Taylor device, none which, had Taylor known of them, would have suggested his own invention. While his device is somewhat crude, as compared with the im-

proved styles of trunk fasteners now in use, it contains the underlying principle of all of them.  In short, we find no difficulty in holding that there is patentable novelty in the Taylor fastener, and that it is not anticipated by any of the devices put in evidence.  If there were any doubt of this, in view of the fact that Taylor seems to have been the first to invent a practical trunk fastener to take the place of the old-fashioned strap and buckle, and that, improved upon, as it undoubtedly has been, it has completely taken the place of the earlier devices, we should be inclined to resolve this doubt in favor of the patentee.

4. The question of infringement is not so easy, as the Romadka patent,[1] under which the defendants manufacture, approximates more closely to the ordinary form of the spring lock than does the Taylor patent.  The difference between the two patents, however, is more in their outward appearance than in their substantial features.  Both resemble the spring lock in having a rigid tang with a notch in it to receive a catch actuated by a spring, and in being self-locking if the catch be closed when the tang enters the socket; both differ from it in the fact that the device may be unlocked without the aid of a key by a simple motion of the finger, and hence is not designed to protect against unauthorized opening.  The essential features of each are the same.  Both have a rigid tang attached to the cover of the trunk — in the Taylor patent with a hole in it, and in the Romadka patent with a notch to receive the catch; both have a socket attached to the body of the trunk containing a hinged catch actuated by a spring which fits into the hole or notch in the tang.  In the Taylor patent the catch is held open and shut by a flat spring, and operates at right angles to the plane of the trunk; in the Romadka device the catch is held by a wire spring, and is moved sideways or parallel with the plane of the trunk by a slight projection at the side of the socket.  Both are identical in principle,

---

[1] No. 163,028, issued April 10, 1875, to Anthony V. Romadka, stated by him to have "for its object a certain improvement upon the fastener patented to me, December 23, 1873," by letters patent No. 145,817, of that date.  [REPORTER.]

operation and design, though the trunk fasteners now in ordinary use resemble the Taylor more than the Romadka patent. In view of the fact that Taylor was a pioneer in the art of making a practical metallic trunk fastener, and invented a principle which has gone into almost universal use in this country, we think he is entitled to a liberal construction of his claim, and that the Romadka device, containing as it does all the elements of his combination, should be held an infringement, though there are superficial dissimilarities in their construction.

5. It only remains to consider the question of damages. Before the invention of these fasteners, straps and buckles were universally used to hold the lid of the trunk fast to the body, in aid of the lock, and dowels appear to have been in common use to prevent a lateral movement of the lid. Trunks with straps to support the lock were considered imperfect and unserviceable, and the dowels had become a recognized necessity, except where strength and durability were of no consequence. In this connection the master allowed the difference between the cost of trunk fasteners and the straps, buckles and dowels previously in use for the same purpose, and the court overruled the measure of damages thus adopted, and entered a decree for nominal damages only.

It seems the defendants did not manufacture these fasteners for sale, but did manufacture them for use on the trunks made and sold by them. Obviously their profits upon the entire trunk would not be a proper measure of damages, since the fasteners were only an inconsiderable part of the trunk, and profits upon the entire article are only allowable where such article is wholly the invention of the patentee, or where its entire value is properly and legally attributable to the patented feature. *Seymour* v. *McCormick*, 16 How. 480; *Mowry* v. *Whitney*, 14 Wall. 620; *Littlefield* v. *Perry*, 21 Wall. 205; *Garretson* v. *Clark*, 111 U. S. 120. This court has, however, repeatedly held that, in estimating damages in the absence of a royalty, it is proper to consider the savings of the defendant in the use of the patented device over what was known and in general use for the same purpose anterior to the date of the

patent. Thus, in *Mowry* v. *Whitney*, 14 Wall. 620, 649, it was said by Mr. Justice Strong, that "it is the additional advantage the defendant derived from the process — advantage beyond what he had without it — for which he must account." In that case the master reported the difference between the cost of certain car wheels and the price for which they were sold as the profits realized by the defendant, thus charging him the profit obtained from the entire wheel, instead of that resulting from the use of the patentee's invention in a part of the manufacture. It was held not to be a legitimate construction of the findings that the benefit which the defendant derived from the use of the complainant's invention was equal to the aggregate of profits he obtained from the manufacture and sale of the wheels as entireties, after they had been completed; but that the question to be determined was — what advantage did the defendant derive from using the complainant's invention over what he had in using other processes then open to the public and adequate to enable him to obtain an equally beneficial result? The same principle was applied in the case of the *Cawood Patent*, 94 U. S. 695, 710, in which the defendant made use of an infringing swage block for the purpose of reforming the ends of railroad rails which had become exfoliated by wear, and it was held that the gain in mending these rails by the use of the plaintiff's device, compared with the cost of mending on the common anvil, and the saving in fuel and labor, were the proper measure of damages. "They had the choice of repairing them on the common anvil or on the complainant's machine. By selecting the latter, they saved a large part of what they must have expended in the use of the former." To that extent they had a positive advantage, growing out of their invasion of complainant's patent." The subject is also fully considered in the case of *Tilghman* v. *Proctor*, 125 U. S. 136, in which it was held that the plaintiff may, instead of damages, recover the amount of gains and profits the defendants have made by the use of his invention, over what they would have had in using other means then open to the public and adequate to enable them to obtain an equally beneficial result. The patent in this case was for a

process of manufacturing fat acids and glycerine from fatty bodies by the action of water at a high temperature and pressure. In his report of damages the master found that the complainant derived no profit from the invention otherwise than by granting licenses to others to use the same, but that the defendant had derived large profits and savings by the use of the plaintiff's patented process, which plaintiff sought to recover in the suit. It was held by this court that, when a bill in equity is filed by the owner against the infringers of a patent, the plaintiff is entitled to recover the amount of gains and profits the defendant has made by the use of his invention, not those he might reasonably have made, but those which he did make, or, in other words, the fruits of the advantage which he derived from the use of that invention over what he would have had in using other means then open to the public and adequate to enable him to obtain an equally beneficial result.

An analogous rule was applied in *Williams* v. *Railroad Company,* 18 Blatchford, 181, 185, wherein the patent was for an improvement in locomotive lamps, which enabled the burning of kerosene instead of lard oil in locomotive head lights. The defendant used a number of the patented lamps on its locomotives, and it was held that its profits were the difference between the cost of the kerosene which it burned and the lard oil which it would have had to burn in lieu thereof but for the use of the plaintiff's lamps. "The statute," said Mr. Justice Blatchford, (Rev. Stat. § 4921,) "expressly gives to the plaintiff, on a recovery in a suit in equity for an infringement, 'the profits' to be accounted for by the defendant. . . . The defendant made its election when it infringed and subjected itself to a suit in equity, and the plaintiff is entitled to the result of the choice he made of suing in equity and not at law. The plaintiff made his inventions for the purpose of enabling any one using them to successfully burn kerosene oil in lamps for locomotive head lights, and to obtain the full advantage of its great light-producing capacity. The defendant used them for that purpose and with that result, and must pay the profits or savings made thereby."

We see no reason why this measure of damages should not be applied to this case. The only argument to the contrary is that the instances in which this court has applied this rule are confined to those wherein the defendant has made use of the complainant's invention in the operation and conduct of his business, and that it ought not to be extended to cases in which the defendant manufactures and sells the devices. Without questioning at this time the soundness of this contention, we think this case falls within the former rather than within the latter category. The defendant does not manufacture and sell trunk fasteners as such, but he does make and use them in the business of manufacturing trunks, and the difference between such use of them and the use of the old-fashioned strap and buckle represents his profits. If the defendant manufactured and sold trunk fasteners to be attached to trunks by his vendees, it might be justly claimed that he did not use them; but if he manufactures them solely to be attached to trunks made and sold by himself, it is none the less a use of them than if he had used the trunk to which they were attached for his own purposes. If, to put an analogous case, a person made a business of manufacturing and selling steam engines to which he attached a patented lubricator, it could hardly be claimed that he was a manufacturer and seller of lubricators, but he would clearly be liable as a user of them.

In such case it makes no difference whether his general business has been conducted at a profit or loss, or whether he has derived an additional profit from the sale of trunks equipped with this device over those not so equipped, although the presumption would be, from the saving made by him in the use of this device, that an additional profit upon the sale of the trunks was made, unless it were shown that the use of this device in some way resulted in a diminution of profits upon the entire manufacture. As was said in the *Cawood Patent*, 94 U. S. 695, 710: "If their general business was unprofitable, it was the less so in consequence of their use of the plaintiff's property. They gained, therefore, to the extent that they saved themselves from loss. In settling an account

between a patentee and an infringer of the patent the question is, not what profits the latter has made in his business, or from his manner of conducting it, but what advantage has he derived from his use of the patented invention." See also *Tilghman* v. *Proctor*, 125 U. S. 136.

The master apparently computed the profits received by the defendants from the infringement upon the basis of the interlocutory decree referring the case to him to ascertain and report the number of fasteners made and used by the defendants, and the gains, profits and advantages they received from the infringement, etc.; and as, in the view we have taken of this case, there was nothing inequitable in this measure of damages, we see no reason for disturbing the report of the master in that particular.

6. Further objection is made to a recovery of profits in this case upon the ground of a non-compliance with the requirements of Rev. Stat. sec. 4900, in failing "to give sufficient notice to the public that the same " (that is, the article) " is patented, either by affixing thereon the word 'patented,' together with the day and year the patent was granted, or when, from the character of the article, this cannot be done, by fixing to it, or to the package wherein one or more of them is enclosed, a label containing the like notice; and in any suit for infringement, by the party failing so to mark, no damages shall be recovered by the plaintiff, except on proof that the defendant was duly notified of the infringement, and continued, after such notice, to make, use or vend the article so patented." The averment of the bill in this connection is " that great numbers of trunk catches, containing and embodying the said invention . . . have been manufactured by your orator and the previous owners of said letters patent, which said catches were marked with the word 'patent' and with the year and day of the month of the date of said letters patent; that the public generally have acknowledged the validity of said letters patent and have generally acquiesced in the right aforesaid of your orator." It appears that the plaintiff did stamp upon the larger sizes the fact and the date of the patent, but that he failed to affix such stamp to the

smaller sizes, on account of the difficulty of marking them in such way that the mark would be legible when the catches were japanned or tinned. It is not altogether clear that the stamp could not have been made upon the smaller sizes, but, in a doubtful case, something must be left to the judgment of the patentee, who appears in this case to have complied with the alternative provision of the act, in affixing a label to the packages in which the fasteners were shipped and sold. He testified in this connection that, with the two small sizes, it was impracticable to cast the stamp upon the castings; but that he always marked the packages "patented." The fact that this device was patented could hardly have escaped the notice of Romadka, since the earliest fasteners made under the patent, which were manufactured and sold by Poinier, were duly stamped, and Romadka had dealt with him, bought bags of him, and said to Sessions that he could have bought the patent for a low price. Although there is an averment in the answer that the defendants have no knowledge or information save from said bill of complaint, whether the catches were marked with the word "patented," etc., and therefore deny the same, there is no denial of their knowledge that the Taylor device was patented; and in view of the fact that all letters patent are recorded, with their specifications, in the Patent Office, a record which is notice to all the world, it is not an unreasonable requirement that the defendant, who relies upon a want of knowledge upon his part of the actual existence of the patent, should aver the same in his answer, that the plaintiff may be duly advised of the defence. *Rubber Co.* v. *Goodyear,* 9 Wall. 788, 801; *Allen* v. *Deacon,* 10 Sawyer, 210.

7. A further point is made that the plaintiff is not entitled to recover for any profits accrued prior to September 12, 1876, when Poinier was adjudicated a bankrupt, that any right of action which he then possessed passed to his assignee and, so long as it remained in his hands, became subject to the statutory limitation of two years within which, by Rev. Stat. sec. 5057, the assignee is bound to institute suit. It is insisted that if he abandoned the claims against third parties for infringe-

ment he abandoned them subject to the limitation of two years within which he was himself obliged to bring suit, and that Poinier himself, and the plaintiff, his assignee, took them subject to that limitation. In this connection the defendant relies upon the case of *Kenyon* v. *Wrisley,* 147 Mass. 476. In this case the assignee abandoned to the bankrupt the right to sue upon a promissory note which he considered worthless, and the plaintiff brought suit upon the same nine years after the adjudication and assignment. It was held that the plaintiff had no right to recover; but the decision was placed upon the express ground that the assignee did not elect to abandon the claim, and did not consent to a suit upon it by the plaintiff, until after his right of action was barred by the statute: and it was held that, as the right of suit upon the note was barred while in the hands of the assignee, it was not revived by the election of the assignee to abandon it to the plaintiff. In *Gifford* v. *Helms,* 98 U. S. 248, and in *Wisner* v. *Brown,* 122 U. S. 214, it was held by this court that purchasers of property from an assignee in bankruptcy could not maintain a suit in equity against third persons claiming adverse interests in such property, if, at the time of the purchase from the assignee, his right of action was, under the bankruptcy act, barred by the lapse of time.

In *Greene* v. *Taylor,* 132 U. S. 415, 443, the court went a step further, and held that if, at the time of the purchase from the assignee, the statute had begun to run against the claim or right in the hands of such assignee, the purchaser took the right subject to the statutory limitation; and to the consequence that when sufficient additional time should have run against it in the hands of the purchaser to make up the entire two years, the claim or right would be wholly barred. "No initiation of a new period of limitation, under any statute, begins to run in favor of the purchaser at the time of his purchase, whether the two years wholly elapsed, or only a part thereof elapsed, while the claim was owned by the assignee." We are of opinion, however, that this rule does not apply where the assignee, before the expiration of the statutory time, elects to abandon the property to the bankrupt. In such case the abandonment

relates back to the commencement of the proceedings in bankruptcy, and the title stands as if no assignment had been made. Such abandonment is not so much a transfer of an existing interest in the assignee as an election on his part to treat the assignment as having never included that claim. We do not find it necessary to express an opinion whether the same rule would apply if, as held in *Kenyon* v. *Wrisley*, the statutory limitation were a bar to an action by the assignee when the abandonment was made.

In the case under consideration, Poinier was adjudicated a bankrupt September 12, 1876, the assignee was appointed October 17, 1876, and the abandonment took place, according to the testimony of Mr. Shepard, early in June, 1878, less than two years from the time the cause of action accrued to the assignee. As Poinier recovered the right to sue infringers by abandonment from the assignee before that right had become barred by the statute in his hands, we think he should be considered as receiving it unaffected by the statute, and that he and the plaintiff, his assignee, were entitled to bring this suit as if the assignment had not been made.

May 16, 1892, judgment was entered that the decree of the court below be

*Reversed, and the case remanded with directions for further proceedings in conformity with the opinion of this court, with authority, however, to the Circuit Court, if in its opinion law and justice shall so require, to modify the total amount of damages as found by the master.*