WINCHESTER REPEATING ARMS CO. v. AMERICAN BUCKLE & CARTRIDGE CO.

(Circuit Court, D. Connecticut.   March 10, 1893.)

Nos. 676, 677, and 678.

1. PATENTS FOR INVENTIONS—ANTICIPATION—CARTRIDGE MACHINERY.
   Letters patent No. 237,605, granted February 8, 1881, to Salisbury, for a wad-winding machine, was for a device in which a strip of paper is automatically fed into a slot formed in one end of an intermittently rotated spindle.   Then the spindle is allowed to rotate, and wind the strip upon it in the form of a coil, until it is stopped by the resistance to rotation developed by the frictional contact of the edge of the coil with the inner periphery of a gauge consisting of a fixed bushing or sleeve, the inner diameter of which exactly corresponds to the diameter of the wads to be formed.   Then the coil or wad is automatically cut from the strip, and the wad is stripped from the spindle, and by appro-

priate automatic means forced into place in the shell. The spindle is given a partial rotation as soon as the wad is stripped from it, and stopped with its slot in the right position to receive again the end of the wad strip. *Held*, that this was not anticipated by letters patent No. 104,- 312, to Conrad Holtz, in whose machine paper was likewise wound on a slit spindle; for in it the paper was cut before the winding commenced, and the stoppage of the spindle was not controlled by the paper or the diameter of the tube as it is in the Salisbury machine.

**2. SAME.**

Nor was the Salisbury patent anticipated by letters patent No. 137,- 773, to Hobbs, for a wad-winding machine; for in this latter the paper is placed in the spindle by hand, and there is neither guiding device, cutter, nor means for automatic stoppage of the spindle.

**3. SAME—CARTRIDGE ASSEMBLING MACHINE.**

Letters patent No. 232,907, granted October 5, 1880, to George P. Salisbury, for an improved cartridge assembling machine, are not anticipated by the patents for similar machines put in evidence, inasmuch as none of them contain the different elements combined in the Salisbury patent, nor are they designed to perform the work which is its function.

**4. SAME—PRIMING MACHINE.**

Letters patent No. 181,309, granted August 22, 1876, to Burton, Salisbury, and Wells, for an improved machine for priming cartridges, covered a machine wherein, in the first place, the loose cap or primers are arranged with their open ends forward in a flat hopper or reservoir, wide at its upper, and narrow at its lower, end, and just deep enough to receive a single vertical layer of caps piled one on the other in a side to side or axial arrangement, and to permit them to move up and down, but not to turn over. From the narrow lower end of this hopper the caps gravitate, without changing their relative axial position, into a guide tube in which they form a single column. An agitator is employed to prevent the caps from clogging over the upper end of the tube, but it does not interfere with their axial arrangement, for on that depends their right presentation when they are taken one by one from the lower end of the tube by a carrier having a pair of spring fingers, and swung over the headed shells which are automatically fed into range. Then a punch descends, and forces the primer into the seat formed for it. *Held*, that as it is essential that the caps be preserved in their axial arrangement, with their open ends forward, this patent is not anticipated by patents wherein articles are placed in the hopper without regard to their relation to each other, and are dependent on mechanism between the hopper and the conductor to bring them into such proper relation.

**5. SAME—INFRINGEMENT.**

The agitator mentioned in the Salisbury patent, which has a vertical reciprocating motion, is infringed by an agitator in a similar machine, performing the same function, but having a vibratory motion to right and left through the mass of caps.

**6. SAME—INFRINGEMENT—PLEADING—WANT OF NOTICE.**

In a suit for the infringement of a patent, allegations in the answer that neither complainant nor any one for it duly notified defendant of the existence of the patent charged to be infringed constitutes no defense, for defendant must negative notice of such patents from any source whatever.

**7. SAME—DISMISSAL OF BILL.**

It is no ground for dismissing the bill in such suit, and remanding complainant to his remedy at law, that defendant has sold his patents alleged to infringe those of plaintiff, and has delivered all patterns and drawings for their manufacture to the purchaser.

In Equity. Suit by the Winchester Repeating Arms Company against the American Buckle & Cartridge Company. Decree for complainant.

Charles R. Ingersoll and George D. Seymour, for complainant.
Henry G. Newton, for defendant.

SHIPMAN, Circuit Judge.   These are three bills in equity which are respectively based upon the alleged respective infringement of three letters patent, viz.:   No. 181,309, dated August 22, 1876, to Burton, Salisbury, and Wells, for an improved machine for "priming" cartridges; No. 232,907, dated October 5, 1880, to George P. Salisbury, for an improved cartridge assembling machine; and No. 237,-605, dated February 8, 1881, to said Salisbury, for a machine for winding and introducing wads into paper cartridge shells.   The respective bills are Nos. 676, 677, and 678.   The machinery described in these patents is designed for the automatic manufacture of paper cartridge shells with metal heads, and which are used in shotguns. The complainant, the owner of each patent, is now, and the defendant formerly was, engaged in such manufacture.   In May, 1889, the complainant brought a bill in equity for an injunction against the defendant's alleged infringement of the wad-winding patent; and on May 24, 1889, the defendant sold to the complainant all its machinery and tools which were used in the paper and brass cartridge shell business, and its partially made shells to be completed by the defendant, and its stock of paper, but not its patents.   The complainant agreed, upon the complete execution of the contract of sale, to withdraw the suit, and waive damages for the previous infringement of the patent. The machinery so sold, consisting of three wad-winding, two priming, and two assembling machines, was retained for a time by the defendant in order to complete the shells, which were being finished under the complainant's inspection, and on August 23, 1889, was delivered to the complainant.   On July 3, 1889, the defendant sold its patents to the Peters Cartridge Company, of Ohio, and also thereupon secretly manufactured for it two full sets of machines for making shells, including two wad-winding, two assembling, and two priming machines, which were, in substance, duplicates of the machines sold to the complainant, and in November, 1889, sent them to the factory of the purchasers in Kings Mills, Ohio, where they were set up by the defendant's workmen.   It also sent the Peters Company, at the same time, its drawings and patterns of these machines, and has not since that time engaged in the manufacture of paper-shell machinery.   The machines were destroyed by fire about July 1, 1890.   The complainant, when it examined the assembling and priming machines which it had purchased of the defendant, was of opinion that they infringed the first and second patents hereinbefore mentioned. These suits were brought in October, 1890.   About May 1, 1892, the complainant brought suits in the United States circuit court for the southern district of Ohio, against the Peters Cartridge Company, for infringement by the use of the machines it had purchased.

Before entering upon a description of the inventions which are described in the three patents in controversy, it is proper to say that the defendant placed in evidence a large number of patents, but has given no testimony in regard to the bearing which they have upon the patents in suit.   The court is therefore deprived of the benefit

which it would have had from an explanation by a mechanic of the defendant's view of the mechanical questions in the cases. The devices described in the three patents were designed to perform automatically the work which had theretofore been done by hand. The tightly-wound base, called a "wad," is wound and inserted in one end of the paper tube, a metal head is placed over the same end, and a primer is put in its proper place in the head. The description of the mechanism which is contained either in the specifications or in the testimony of the complainant's expert is and must be long, if accuracy is to be attained, and without the aid of drawings cannot be very clear. I therefore use the much shorter statements which are contained in the complainant's brief, and which are sufficiently explicit for the purpose of a general description. As the winding of the wad precedes the other operations in order of time, the mechanism of No. 237,605 is first explained:

"A strip of paper is automatically fed into a slot formed in one end of an intermittently rotated spindle, much the same as a needle is threaded, but for the difference that one is an automatic, and the other a manual, operation. Then the spindle is allowed to rotate, and wind the strip upon it in the form of a coil, until it is stopped by the resistance to rotation developed by the frictional contact of the edge of the coil, with the inner periphery of a gauge consisting of a fixed bushing or sleeve, the inner diameter of which exactly corresponds to the diameter of the wads to be formed. Then the coil or wad is automatically cut from the strip. Then the wad is stripped from the spindle, and is ejected from the bushing into a tube which has been automatically expanded and brought into position to receive it, the spindle being given a partial, intermediate rotation as soon as the wad is stripped from it, and stopped with its slot in right position to again receive the end of the stock or wad strip, and then allowed to rotate again until stopped by the wad, thus newly wound upon it, and so on."

Inasmuch as the spindle is not stopped after a predeterminate number of revolutions, but, by the wad, after an undeterminate number, which depend upon the thickness of the strip of paper which forms the wad, there must be a partial rotation of the spindle between its winding rotation, so as to bring its slot again into the right position to have another end of the wad strip fed into it. This operation of the spindle is provided for—

"By furnishing it with a small pulley, over which a friction belt runs constantly when the machine is in operation, and with a positive stop mechanism, which operates intermittently, and which holds the spindle with its slot in right position to receive the end of the wad strip, against the power of the friction belt, which at this time slips on the said pulley. The action of the said stop mechanism is timed, so that, as soon as the strip has been fed to the spindle, it releases the same, and permits the friction belt to reassert itself, and rotate the spindle until it is overpowered by the friction developed between the bushing and the wad now on the spindle, which will be stopped and held again, this time by the wad, the belt again slipping on the said pulley; but, the moment the wad has been stripped from the spindle, the friction belt again comes into play, and carries the spindle through an intermediate, partial rotation, which while varying in degree, is always sufficient to bring it into right position to receive the stock strip, in which position it is arrested by the stop mechanism, which is brought into operation for the purpose."

The five claims which are alleged to have been infringed are as follows:

"(2) In a wad winder, the combination of the revolving spindle, constructed to engage the end of the strip from which the wad is to be wound, a stop to arrest the revolution of the spindle in position to receive the end of the strip, a feeding device to force the end of the strip into engagement with the spindle, and a cutter, operating to cut off the strip when the requisite length has been taken by the revolving spindle, substantially as described. (3) In a wad winder, the combination of a revolving spindle, constructed to engage the end of the strip from which the wad is to be wound, a sleeve around said spindle, and within which the wad is wound, a stop to arrest the spindle when in position to receive the end of the strip from which the wad is to be wound, a feed to present the end of the strip for engagement with the spindle, and a follower within said sleeve to eject the completely wound wad, substantially as described. (4) In a wad winder, the combination of a revolving spindle, constructed to engage the end of the strip from which the wad is to be wound, a sleeve around said spindle, and within which the wad is wound, a stop to arrest the spindle when in motion to receive the end of the strip from which the wad is to be wound, a feed to present the end of the strip for engagement with the spindle, a follower within said sleeve to eject the completely wound wad; with a cutter operating to cut off the strip when the requisite length has been wound, substantially as described. (5) The combination of a wad-winding mechanism in which the winding spindle is constructed to engage the end of the strip from which the wad is to be wound, with feeding devices, substantially such as described, to present the cartridge tubes into axial line with the said winding spindle, and a follower to force the wad from the spindle into the tubes, substantially as described. (6) The combination of a wad winder, substantially as described, with feeding device, substantially such as described, to successively present the cartridge tubes to the wad winder to receive the wad, with a device, substantially such as described, to expand the end of the tube to receive the wad, and a follower to force the wad from the spindle into the tube, substantially as described."

It will be perceived that each of these claims is for a combination of several elements, each one of which performs one of the successive operations which have been described. No pre-existing machine contained these respective combinations. The pre-existing mechanisms which have the most important bearing upon this patent are those described in the patents to Conrad Holtz, No. 104,312, and to Alfred Charles Hobbs, No. 137,773. The Holtz machine was for making paper tubes for use in spinning machinery, and had a split spindle around which the paper was wound in tubular form and an ejector; but the piece of paper was cut before the winding commenced, whereas in the machine of Salisbury the piece of paper is not cut until the predetermined external diameter has been attained. Moreover, the spindle of the Salisbury machine is stopped when this required diameter of the tube has been attained, whereas in the Holtz machine the stoppage of the spindle is not controlled by the paper or the diameter of the tube. The essential peculiarities of the Salisbury machine do not exist in the Holtz device. The Hobbs patent is for a wad-winding machine, and contains a split spindle and an ejector; but inasmuch as the paper is placed in the spindle by hand, and has no guiding device, there are no means for the automatic stoppage of the spindle, and there is no cutter. The absence of feeding device, sleeve, stop, and cutter prevent this machine from anticipating the combinations which are present in each of the quoted claims of the Salisbury patent.

The patentee says in the specification of the "Assembling Machine" patent:

"Paper cartridge shells, such as are ordinarily used in shotguns, are composed usually of four parts, viz.: An open-ended tube, which constitutes the body of the shell; second, a short tube called a 'reinforce;' third, a wad to close the ends; and, fourth, a metallic cap or head. Heretofore these parts have been put together, or, as it is technically termed, 'assembled' by hand, which is necessarily a slow and tedious process. The object of my present invention is to produce a machine by which this work may be done automatically by simply supplying it with the parts before mentioned. The machine may be of various forms or styles; but the style shown in the accompanying drawings is one of the simplest and most convenient known to me."

The wad-winding machine had not been invented when the assembling machine patent was applied for, and therefore it is only necessary to state in general the mode of operation of the parts of the machine which have no reference to the manipulation of the wad, and which are included in claims 3 and 4:

"Tubes, each with a wad in one end, are stuck by hand, wad end up, on vertically arranged pins carried by an intermittently rotated horizontal dial, which presents them to the action of crimpers, whereby their upper ends are contracted, and cups or heads are thrown open side up, on a horizontal friction-feed dial, which co-operates with a fixed guide or channel located just above it, to feed them in single file onto a bed or table, from which they are picked up one by one by a pair of oscillating, spring fingers, which swing them over the contracted ends of the tubes, when a punch comes down and drives them thereupon, the tubes or shells being then automatically picked off the pins and discharged from the machine."

The third and fourth claims are as follows:

"The crimping tools, f and g, arranged to operate consecutively on the shell or tube, b, to prepare it for the reception of the metal head, in combination with mechanism, substantially such as described, for delivering and forcing the metal head upon the shell, as set forth. (4) The combination of a shell-carrying dial, D, a friction feed dial, L, with the spring transfer jaws, m, and reciprocating punch, h, for feeding, placing, and forcing the metal head on the shell, substantially as described."

The patents for cartridge machines which the defendant has put in evidence describe, as a part of the mechanism, intermittently rotating disks, and sometimes in connection therewith tubular punches, but do not contain the different elements which are in combination in the third and fourth claims, or equivalents therefor; and neither of these patents describes a machine which was designed to perform the work which was the office of the Salisbury machine. For example, in the Payne patent, No. 50,489, a descending punch passed upon the open end of the shell, and swaged or reduced the shell, throughout a portion of its length, from that end towards the head; while in the Salisbury machine a reciprocating punch came down upon the head end of the tube, and crimped it around its edge, so as to prepare it for the cap. The invention contained in the priming machine is said in the specification of the patent to have consisted in an improved device for feeding caps or primers to cartridge shells, and in a novel contrivance for setting the caps or primers in place. The following description states as briefly as I think is practicable the characteristics of the machine:

"In the first place, the loose caps or primers are arranged with their open ends forward, in a flat hopper or reservoir, wide at its upper and narrow at its lower end, and just deep enough in transverse section to receive a

single vertical layer of caps piled one on the other in a side to side or axial arrangement, and to permit them to move up and down, but not deep enough to let them turn over. From the narrow lower end of this hopper the caps gravitate, without changing their relative axial positions, into a guide tube, in which they form a single column. An agitator is employed to prevent the caps from clogging over the upper end of the tube, but, though it moves them about, it does not interfere with their axial arrangement, for on that depends their right presentation later on, when they are taken one by one from the lower end of the tube by an oscillating carrier, having a pair of spring fingers, and swung over the headed shells, which are automatically fed into range with the said fingers by an intermittently actuated dial, furnished with pins, on which the shells are struck by hand. Then, when the fingers have swung a cap over a shell thus presented, a punch comes down between the fingers, and pushes the primer into the seat formed for it in the sheet-metal cup or head which was put onto the tube of the shell in the assembling machine. The primer is now in place, and is retained therein by the friction between its sides and the sides of the said seat. A spring-actuated stop normally closes the lower end of the guide tube, and holds the column of caps therein, while a movable, spring-actuated gate is provided to stand in front of the fingers of the carrier when they are separated to take a cap, and prevent the same from falling outward through the fingers in which the gate retains it until they close upon it, and need no further assistance. A pointed screw is arranged to separate the fingers when they are brought into position to take a cap or primer from the lower end of the guide tube. It will be readily understood that it is imperative that the caps be arranged with their open ends outward, and so passed on through the machine, for in no other way can their right presentation to the cups of the shells be insured. The construction by which that arrangement is held is one of the leading features of the invention disclosed in the patent in suit, and the oscillating carrier having spring arms is another, but above either is the automatic character of the machine."

The claims of the patent are as follows:

"(1) The magazine or hopper, D, with the reciprocating tube, T, constructed to operate substantially as and for the purpose set forth. (2) The combination of the hopper, D, reciprocating tube, T, and the stationary tube, G, substantially as set forth. (3) The pivoted arm, N, provided with the spring clamps, a, in combination with the gate, L, the yielding stop piece, H, and the pointed pin or screw, J, all constructed and arranged to operate substantially as described, whereby the primers are transferred from the tube, G, to the head of the shell, as set forth. (4) The combination, substantially as set forth, of the tube, G, stop, H, carrier arm, N, sliding gate, L, and reciprocating punch, M, all arranged to operate substantially as set forth. (5) In a capping machine, a pivoted or swinging arm, N, constructed to operate substantially as described, whereby it shall receive a primer from the mouth of a supply tube, and transfer it to a cartridge shell, substantially as set forth."

The devices shown in the patents introduced by the defendant present to the eye more apparent resemblances to the mechanism of the patent in suit than do the alleged anticipations of the other patented inventions. They show hoppers and single file conductors, which have a general external likeness to the hopper and conductor of the patent in suit, and they also contain agitators, but they do not possess the peculiarities of the machine in controversy. The defendant has introduced, without explanation, some 16 patents as an anticipation of No. 181,309. I shall not assume the unnecessary burden of endeavoring to explain each device, but shall content myself with stating the result, which is manifest with sufficient clearness, and which I state in the language in which the complainant's expert has summarized his conclusions:

"The hopper of the patent in suit differs essentially from the construction of any of the hoppers in the patents to which I have referred. In the hoppers of all the patents so referred to, the hoppers are irrespective of the shape of the articles to be placed therein, and so that the articles are dumped in mass therein, irrespective of the relation of one article with another, and are dependent upon a mechanism between the hopper and conductor to bring them into proper relation to each other in or on the conductor; whereas in the patent in suit the hopper is constructed of a width corresponding substantially to the length of the primers or caps to be placed therein, and so that the caps, in order to enter the hopper, must have their axes all parallel with each other, and not only in such relation to each other, but they must have their open ends all in the same direction, and because of this shape of the hoppers it is impossible to change the axial relation of one cap to another while it is in the hopper or passing through it. Again, the conductor of the patent must be in such relation to the hopper that it will receive caps direct from the hopper without the possibility of changing the axial relation of the caps or primers. Again, the agitator which is combined with the hopper is, and must be, of such a character that, while agitating the caps at the delivery end of the hopper to prevent clogging, it cannot act to disturb the axial relation of the caps. Neither of the patents prior to the patent in suit shows a hopper combined with an agitator like the hopper and agitator of the patent in suit, or any equivalent therefor, and therefore neither of the patents contains, in my opinion, the invention of the first claim of the patent in suit. For the reasons given regarding the first claim, none of the patents referred to, in my opinion, contain the invention recited in the second claim, which includes the combination of the hopper and agitator of the first claim, with the conductor, as I have described; neither do those patents disclose any equivalents therefor. None of the patents disclose mechanism substantially like or equivalent for the devices for transferring the primers as in the patent in suit, and therefore, in my opinion, do not contain the invention recited in the third, fourth, or fifth claims of the patent in suit, or any equivalent therefor."

Upon the question of infringement, no attempt was made upon the oral argument by the defendant to discriminate between the wad winding and the assembling machines, which were made by the defendant, and were sent to Kings Mills, and the complainant's respective patents, so far as these machines were claimed to have infringed. The defendant, in argument, denied infringement of the priming machine patent principally upon the ground of the difference in the character of the agitators. The defendant's agitator vibrated or swung to the right and left through the mass of primers, instead of having the vertical reciprocating movement of the complainant's device; but this change created only an apparent, and not a real, difference. Upon this point it is important to state that the defendant's agitator was not the one shown in the William B. Place patent, No. 406,466, dated July 9, 1889.

The questions in regard to a decree remain to be considered. It is admitted that the machines which the complainant made and used contained no notice of their patented character, and it is claimed that the defendant was ignorant of the existence of the assembling machine and priming machine patents, and that, therefore, no damage can be recovered against it for their infringement. Knowledge of the existence of the wad-winding patent after May 24, 1889, is conceded. The defendant's answers in Nos. 676 and 677 each aver that it was never duly notified by the complainant, or by any one for it, of the alleged infringements before the filing of the bills, and that it did not make infringing machines after

it had been notified. The answer did not aver the defendant's ignorance before it made the machines, and of the existence of the complainant's letters patent, and that they were being infringed by such manufacture, but cautiously averred that it was not duly notified by the complainant, or by any one for it. The defendant, "who relies upon a want of knowledge, upon his part, of the actual existence of the patent, should aver the same in his answer." Sessions v. Romadka, 145 U. S. 29, 12 Sup. Ct. Rep. 799. The conduct of the defendant, coupled with the testimony of Dunn, the mechanic who made the infringing machines, shows that it had actual knowledge of the existence of the patents owned by the complainant, and that it had received information, while the machines were being made, that they infringed.

It is next insisted that the complainant is not entitled to relief in equity, because, although infringement had taken place, yet it must be apparent from the sale of the patents and the delivery to the purchaser of all the defendant's patterns and drawings that it had necessarily abandoned the manufacture of cartridge machinery; that an injunction was therefore useless, and should not be issued merely for the purpose of compelling the defendant to an accounting, but that the complainant should be sent to an action at law. The patents upon which the bills are based are still in life. When the cases were brought, the complainant sought equitable relief to protect itself against renewed infringement. An abandonment of intention to infringe does not destroy or take away the jurisdiction of the court, which has, notwithstanding, the power to grant either an injunction or the incidental relief of an accounting. It is a matter of discretion. Clark v. Wooster, 119 U. S. 322, 7 Sup. Ct. Rep. 217. In my opinion, the cases were properly brought. The defendant, without controversy, knew in 1889 that it was infringing the wad-winding machine patent. It infringed under circumstances of some aggravation, and the complainant might properly think that it would be willing to reengage in infringement, and again build machines for the Ohio company. The mere fact that a court can properly find that renewed infringement will not probably take place is no sufficient ground, after the testimony has been taken, for dismissing the bills, turning the complainant out of court, and compelling it to seek for damages in an action at law.

Let a decree be entered in No. 676 for an injunction against the infringement of letters patent No. 181,309; in No. 677 against an infringement of the third and fourth claims of No. 232,907; and in No. 678 against an infringement of the last five claims of No. 237,605; and for an accounting in each of said cases.