MANHATTAN GENERAL CONST. CO. v. HELIOS–UPTON CO.

(Circuit Court, E. D. Pennsylvania.   February 6, 1905.)

1. PATENTS—CONSTRUCTION—METHOD PATENT.

A patent for a method of maintaining a constant electric current in an alternating current circuit, in which there are translating devices in series, is not limited by the description therein of an apparatus for practicing such method, which must be taken as merely illustrative.

2. SAME—METHOD OR PROCESS—PATENTS.

To support a process or method patent there must be a tangible product, or a change in character or quality brought about, and not simply a principle or result underlying or involved in certain mechanical or electrical means or steps.   Telephone cases, 126 U. S. 1, 8 Sup. Ct. 778, 31 L. Ed. 863, distinguished.

[Ed. Note.—For cases in point, see vol. 38, Cent. Dig. Patents, §§ 6, 7.]

3. SAME—METHOD OF REGULATING ELECTRIC CURRENT.

The Baker patent, No. 684,165, for a method of regulating electric circuits, is void, as being merely for an operative theory, and one which, if sustained, would monopolize every means by which such theory may be utilized or applied.

4. SAME—MECHANICAL PATENT—ABSTRACTION.

Where no concrete conception can be worked out of a claim for a mechanical patent, nothing, indeed, but an ill-defined principle of construction, the only key to which is the abstract result to be attained, it cannot be sustained.

[Ed. Note.—For cases in point, see vol. 38, Cent. Dig. Patents, §§ 7, 9.]

5. SAME—SPECIFICATIONS—HOW FAR RECEIVED TO REMEDY CLAIMS.

A claim for a mechanical or apparatus patent, otherwise invalid as an abstraction, will not be sustained by reference to the specifications, where it not only goes far beyond anything which is there suggested, but fails to refer to that which is admittedly a distinguishing feature of the invention upon which its novelty is made to depend.

6. SAME—LIMITATIONS IMPOSED BY SEPARATE SPECIFIC CLAIM.

While an invention is undoubtedly to be regarded as residing in a structure of the same general character as that which is described in the specifications, to which the inventor is to be confined, this does not restrict him to the particular form to which prominence is there given, where it is evident that he had variations of it in mind, and has formulated a claim in broad terms to cover them; the particular form having also been made the subject of a separate claim.

7. SAME—DISCLAIMER AFTER ISSUE—PURPOSE AND EFFECT OF—PRIOR ART—ADMISSION.

The purpose of a disclaimer after issue is to take out of a patent that which has been mistakenly or inadvertently included in it, by which it is made too broad.   It must be of some distinctive and separable matters, and may be made use of to avoid the effect of having included more devices than could properly be the subject of one patent, or to remove an ambiguity.   Matters so disclaimed cease to be a part of the invention, and the patent is to be construed as though they had never been included in it.   They are not, however, to be taken as admitted to have been a part of the prior art.

8. SAME—VALIDITY AND INFRINGEMENT—REGULATOR FOR ARC LIGHT CIRCUITS.

The Baker patent, No. 684,340, for a regulating device for arc lamp circuits, claim 1, is void as too broad and abstract in its terms.   Claim 4 was not anticipated by anything in the prior art, but covers a device of greater simplicity and a greater range of effectiveness than any previously known, and discloses patentable invention.   Such claim is not

135 F.—50

confined to the specific device described in the specification, which is illustrative only so far as said claim is concerned, but covers any other device of the same general character, and which comes within the terms of the claim, and operates on the same principle as that shown; nor was it limited by the amendment of the specification made in the Patent Office in relation to the description of such device. As so construed, also *held* infringed.

**9. SAME—CONSTRUCTION OF CLAIMS—AMENDMENT OF SPECIFICATION.**

Claims of a patent are to be taken as they read, and are not limited by an amendment of the specification more particularly describing the device shown in the drawings to meet objections of the Patent Office, where the claims themselves are left unchanged.

**10. SAME—OTHER CONTEMPORANEOUS PATENTS BY SAME INVENTOR.**

An invention covered by a patent is not necessarily to be cut down by the fact that, while the application for it was pending in the Patent Office, other applications were brought forward from time to time by the same inventor, representing different developments of the same idea; all being allowed and issued the same day.

In Equity. Suit for infringement of letters patent No. 684,165 for a method of regulating electric circuits, and No. 684,340 for a regulating device for arc lamp circuits, both granted to Malcolm H. Baker, October 8, 1901. On final hearing.

Thomas B. Kerr and Richard N. Dyer, for complainant.
Joseph C. Fraley, for defendant.

ARCHBALD, District Judge.[1] The difficulty in the use of the alternating current for electric lighting, in a circuit with arc lamps in series, lies in the fact that the potential of the current having necessarily to be kept constant, at the maximum required for the full number of lamps, as these are severally turned off one by one there is an accumulation of pressure, due to the varying decrease of

resistance, which is destructive to the apparatus employed. The means proposed to meet and obviate this in the patents in suit is the insertion in the circuit in series with the lamps of a reactance device, consisting of an induction coil and core, which are drawn together by the varying magnetic pull, as the energy of the current is increased by the cutting out of lamps, this being counterbalanced

[1] Specially assigned.

by an opposing mechanical force, consisting, as portrayed in the patents, of a lever and weight, the whole being so co-ordinated and arranged by means of a critical angle given to the lever (empirically determined according to the number of lamps and the amperage of current employed) that the core is always in position to successfully choke off or release the current to the extent required. The defendants make use of a similar core and coil, but the latter is hung vertically on a rigid arm like a pendulum, and operates as a counterbalance by its own weight, an equilibrium between the magnetic pull and the force of gravitation being found in the increasing effect of the latter as the coil is drawn upwards away from the perpendicular in the arc of a circle. It is denied that this infringes either

of the complainants' patents, except as they are given an unwarranted breadth of construction; and the novelty of the invention which they cover is also contested, outside at least of the special and peculiar features which are there described. These, then, are the issues presented for determination.

The patents relied upon were both granted to the complainants, as assignees of Malcolm H. Baker, the inventor, October 8, 1901; one being for the method of regulation, and the other for the mechanical apparatus or means by which it is accomplished, the specifications of the two being substantially the same, the result of a divided application. The method patent has four claims, differing somewhat in phraseology and breadth, but with no practical distinction between them, of which the first may be taken as sufficiently representative:

"(1) The method of maintaining a constant current in an alternating current circuit including translating devices in series and also including a reactance-coil in series with the translating devices, which consists in opposing to the magnetic pull of the coil a mechanical force, and so correlating the said mechanical force and the magnetic pull that the choking effect of the coil will vary automatically to compensate for changes in the resistance of the circuit."

If this is valid, the defendants clearly infringe, the device which they put out making use of the exact method so described. As just stated, they have a reactance-coil in series with the lamps, in an

alternating current circuit, the coil being hung like a pendulum, and the magnetic pull between it and the core, which is set above and in juxtaposition to it, being opposed by the weight of the coil and its inclination to swing back under the force of gravity to an approximately vertical position; the two opposing forces being so adjusted by previous experiment, as to the proper weight of the coil and the distance and angle at which the core is to be set, that the choking effect of the two will compensate automatically for the changes in the resistance of the circuit in which the device is to be employed. This is not to be disposed of by the suggestion that the specifications describe a particular form of apparatus of an essentially different kind from that of the defendants', in which the opposing mechanical force consists of a counterbalancing lever and weight not found, as it is said, in the defendants' device, to which in consequence the complainants are confined. What is shown in the patent must be taken simply as illustrative, and not as imposing a limitation, this being a method patent, and not, therefore, tied down to any concrete form. If it is good at all, it covers every means for the maintenance in the manner described of a constant current in an alternating current circuit in which there are translating devices in series. Neither can it be limited by the prior art, no such method being anywhere there found, the regulating reactance devices which do appear—as we shall more fully see in connection with the apparatus patent—differing materially in principle and mode of operation from anything we have here. Some which have been referred to have not the same purpose or scope, while in those which approach the nearest either a transformer is employed, or magnetic repulsion is the force relied on instead of magnetic attraction; this being not simply a matter of different polarity, but of strength and consequent action and treatment as well as results.

These observations, however, develop the weakness and inherent vice of the patent. It is not limited to any particular mechanical construction, because it monopolizes every form of regulation of the character specified, in which there is a correlation between the magnetic and mechanical forces employed, and that, too, without indicating, except by the broadest generalities, upon what basis that correlation is to proceed. We have practically nothing more than the forces made use of, the fact that they are to be correlated, and the result to be produced. This carries it beyond anything which it was the design of the patent law to secure and protect. But, more than this, to support a method or process patent there must be a tangible product or a change in character or quality brought about, and not simply a principle or result underlying or involved in certain mechanical, or, as here, electrical, means or steps. O'Reilly v. Morse, 15 How. 62, 14 L. Ed. 601; Corning v. Burden, 15 How. 252, 14 L. Ed. 683; Fuller v. Yentzer, 94 U. S. 288, 24 L. Ed. 103; Cochrane v. Deener, 94 U. S. 780, 24 L. Ed. 139; Tilghman v. Proctor, 102 U. S. 707, 26 L. Ed. 279; Wicke v. Ostrum, 103 U. S. 461, 26 L. Ed. 409; New Process Fermentation Co. v. Maus, 122 U. S. 413, 7 Sup. Ct. 1304, 30 L. Ed. 1103; Risdon Locomotive Co. v. Medart, 158 U. S. 68, 15 Sup. Ct. 745, 39 L. Ed. 899.

As said by Mr. Justice Brown in Westinghouse v. Boyden Power Brake Co., 170 U. S. 537, 18 Sup. Ct. 707, 42 L. Ed. 1136:

"These cases assume, although they do not expressly decide, that a process, to be patentable, must involve a chemical or other similar elemental action, and it may be still regarded as an open question whether the patentability of processes extends beyond this class of inventions. Where the process is simply the function or operative effect of a machine the above cases are conclusive against its patentability."

Even in the Telephone Cases, 126 U. S. 1, 534, 8 Sup. Ct. 778, 782, 31 L. Ed. 863, in which the court went to the extreme, it was pointed out by Chief Justice Waite that the claim was—

"Not for the use of a current of electricity in its natural state, as it comes from the battery, but for putting a continuous current in a closed circuit into a certain specified condition suited to the transmission of vocal and other sounds, and using it in that condition for that purpose. So far as at present known, without this peculiar change in its condition it will not serve as a medium for the transmission of speech, but with the change it will. Bell was the first to discover this fact, and how to put such a current in such a condition, and what he claims is its use in that condition for that purpose."

This decision lends no countenance, therefore, to the idea that the operation of an electric force stands any different before the law from that of a mechanical force, or that a method devised for utilizing its peculiar properties and action can be patented any more than a method for utilizing those of any other element. In the present instance it is clear that the so-called method which is sought to be patented is merely the operative theory which is the basis of the apparatus patent. The one is the idea or principle of which the other is the concrete embodiment, the identity of the two being established by the specifications common to both. And if the method patent is sustainable the apparatus patent is redundant and superfluous, as are also all the others applied for by the same inventor and simultaneously taken out, the method covering the whole ground. It is thus virtually an attempt to monopolize the common underlying principle or mode of operation of them all, and of all others in which it might be employed, and as such cannot be sustained.

The apparatus patent as originally issued had five claims; but the third and fifth have been eliminated by a disclaimer, and the second has been withdrawn, leaving the first and fourth as the ones relied upon, as follows:

"(1) In an electric circuit, a regulating reactance device having operating parts whose relative position determines the choking effect of the device, magnetic means for causing relative movements of the parts, and mechanical means for controlling such movements, these mechanical means being adapted to so control the movements as to produce definite predetermined choking effects."

"(4) In an alternating circuit a series of translating devices and a regulating reactance-coil [device] having a moving part adapted, when moved to different positions by the magnetic pull of the coil, to cause varying choking effects, the said moving part being acted upon by a force opposing the magnetic pull, which force is so adjusted throughout its effective range of operation as to counterbalance the magnetic pull when the moving part is in such positions with respect to the coil as are adapted to produce constant current."

Taken as it reads, the first of these is a mere abstraction. The only approach to anything definite is that there shall be an electric circuit, with a regulating reactance device, having operative parts, whose relative movements, under the control of unspecified magnetic and mechanical means, shall be adapted to produce certain predetermined choking effects. But of what, in kind or character, these operative parts are to consist, or what are to be the magnetic means for causing relative movement to them, or the counter mechanical means for controlling such movement, is not in the slightest respect indicated. There is, in other words, no concrete conception to be worked out of the claim, nothing, indeed, at best, but an ill-defined principle of construction, the only key to which is the abstract result to be attained. If it be said that it is to be read in the light of the specifications, it is to be noted that it goes far beyond anything which is there suggested, the invention being there declared to relate "to improvements in regulators for alternating current arc lamps arranged in series," not a word of which is to be found in the claim. But more than this, it fails to refer in the remotest degree to that which is admittedly one of the distinguishing features of the invention, upon which in large part its novelty, when brought into comparison with the prior art, unquestionably depends, and that is the magnetic pull between the coil and core of the choking device, as contrasted with magnetic repulsion, which is made use of in the general electric regulators, among others, based on one of the Thomson patents. Not every "magnetic means," in other words, was open to the inventor, which is the virtual reading of the claim, but only the particular means which, according to the specifications, he was supposed to make use of, and to which by the prior art he was confined, which the claim entirely disregards. Passing beyond the bounds of the specifications as it does, and dealing in generalities and abstractions, the claim must therefore be regarded as inherently defective and invalid.

In order to pass upon the remaining claim, a more particular examination into the character and scope of the invention in suit than has yet been undertaken must be made.

"My invention," it is said by the inventor in the specifications, "relates broadly to automatically varying the reactance in a circuit such as described [that is to say, containing alternating current arc lamps arranged in series] to compensate for changes in the resistance of the circuit due to the cutting in or out of lamps or to any other cause. Otherwise expressed, my invention relates to automatically varying the value of a variable reactance in the circuit in accordance with changes of resistance in the said circuit in such a manner as to maintain the current practically constant. In carrying out my invention, I include in the circuit in series with the lamps a reactance device consisting of a coil of wire so placed as to have a free relative movement with respect to a laminated core inside the coil. It is well understood that the current passing through a coil having such a relation to a magnetic core is more or less choked or impeded, according to the relative position which the coil and the core occupy, the choking or impeding effect increasing with the farther and farther insertion of the core within the coil, and decreasing with the gradual withdrawal of the core from the coil. The relative movements of the coil and the core may be brought about by variations of the magnetic pull due to variations of the current passing through the coil. If now a force could be discovered which would automatically vary the choking effect produced in the coil in correspondence with variations in the resistance of the circuit, which force should oppose and vary with the

magnetic pull of the said coil, the value of the current traversing the coil might be made practically independent of the resistance of the circuit, so that a constant current could be maintained irrespective of the number of lamps in operation in the circuit. I have discovered that such a force can be supplied mechanically in several ways. In the present instance I make use of a compensating lever carrying a weight, and I attach to the end of said lever

remote from the weight either the laminated core or the coil, as the case may be, of a reactance device, and I pivot the said lever at such a point as to form a critical angle between the outer part of the lever and the inner part—that is to say, the two parts of the lever on opposite sides of the pivot —it being presupposed that the inner part of the lever will be approximately horizontal when the magnetic pull of the coil is at its minimum, while the outer portion of the lever will be in a position of least effectiveness at the same moment. A simple way of determining the critical angle for the lever of the compensating device is to construct a coil having a sufficient number of turns to show the proper voltage and amperage under the condition of no load, and then to connect the moving part of the apparatus containing the coil with a straight lever pivoted at a point between its ends, and carrying at its outer end a sliding counterbalance. Then, by cutting into the circuit successively one lamp after another until the maximum number of lamps is cut in, and at each successive step sliding the counterbalance into such a position that the readings of the ammeter will always show the normal current on the line, it will be found that between the extreme limits of its movement the sliding counterbalance will have traveled through a curve which is approximately the arc of a circle. It is manifest that the center of the arc just described lies outside the pivot of the straight lever. The object sought in making the lever angular is to utilize this pivot as the center of motion, so that a weight attached to the end of the lever by some permanent means of attachment, such as suspension therefrom, will during the movements of the movable part of the reactance device from one extreme of its motion to the other follow substantially the same curve as that traversed by the sliding counterbalance already described. It will be understood that, as lamps are successively cut into the circuit in the process described above, the sliding counterbalance has to be moved by hand nearer and nearer to the pivot in order to meet the conditions set forth above, and it will also be under-

stood that the counterbalance moves during the same period through a curve in a downward direction, each successive change in the position of the counterbalance representing a single unit of movement corresponding to the switching in of a single lamp or other unitary translating device. The same will be true respecting the action of a weight of equal amount permanently attached to the end of a bent lever, provided the angle given to the lever is selected according to the method above described. We may suppose, for example, that the circuit is to carry a current of two thousand volts and seven amperes. The first requirement is that a coil should be provided having a sufficient number of windings to meet the described conditions, and being provided with a core of sufficient size to prevent undue heating. These conditions being attained, it is easy to determine the critical angle for the lever.

\* \* \* \* \* \* \* \* \*

"It is immaterial whether the weight, 9, or any other counterweight or force, is attached to the coil or the core; the relative movements of these two parts being the feature upon which the choking effect depends. When the compensating lever is attached to the core of the reactance device instead

Fig.6

Fig.7

Fig.8

of to the coil (it being assumed that the coil is arranged above the core) the core itself forms part of the mechanical force opposing the magnetic pull of the coil."

Comparing what is so specified and described with the prior art—which will be regarded as comprised within the references discussed by counsel—it will be found to be beset with some limitations. Thus, in United States patent No. 377,217, to the eminent American electrician Elihu Thomson (1888), a reactance device for use in an alternating current circuit is shown, consisting of a coil and core, arranged to act either by attraction or repulsion, or by a combination of both, avail being also made of the assistance of a counterbalancing lever and weight. The possibility of utilizing this for purposes of regulation is

distinctly claimed, the current in the coils being cut down, as it is said, as the magnetic core is drawn into them. The agencies employed in this device are thus, in a general way, common to the one in suit, and the purposes of the two are to a certain extent the same. But, whatever the limitations so imposed, there is nothing which amounts to an anticipation, the device being altogether too imperfectly developed for that. The difficulty is that while the inventor claims that it may be used as a regulator he fails to tell us how. And, assuming that the complainants are confined to a lever and weight, there is an entirely different use of these, the two acting merely as a counterpoise to the weight of the core, and not as an opposing mechanical force to the magnetic action between coil and core. Much less is there any correlation or adjustment between these forces, in order to vary the choking effect in the coil, corresponding with the variations in the resistance of the circuit, so as to maintan the current constant, as in the complainants' device.

The patent to the same inventor (Thomson) No. 397,616 (1889) comes a step nearer. This, in one form, is designedly a reactance device for automatically maintaining a constant alternating current with lamps in series, by relieving from the effect of an excessive potential when one or another lamp is cut out. In Fig. 4 is shown a hood or band, enveloping and tending to close down upon a coil in circuit with the lamps, which coil in turn encircles a laminated iron ring. The effect of the coil and ring is to choke the current, and it is to regulate this that the hood or band is designed. Being set, by means of the counterbalancing

weight and spring, at a point where the current is normal, as the pressure or energy is increased in the coil, by the cutting out of a lamp or lamps, the inductive effect on the hood or band is increased, repelling it upwards and uncovering more of the coil, thereby allowing the latter to exercise greater self-induction or reactance, and so impeding the current. While, on the other hand, if for any reason the current is enfeebled, or its energy taken up, the hood, gravitating by its own

weight and being repelled to a less extent, moves down over the coil, restricting its reactive or choking power, and freeing or restoring the pressure of the current. It will be noted that the effective thing in this arrangement is the correlation between the reactive coil and the hood, in which the weighted arm and spring play a very inconsiderable part, acting as a mere counterpoise to the hood, and in no sense as a mechanical force opposed to the magnetic force which operates upon the hood, and varying to meet it as in the device in suit. There is thus a clear distinction in principle between the two, in addition to the fact that the one makes use of repulsion and the other of attraction; all that can be said of them—if, indeed, that—being that they belong to the same broad class. It may be added, in passing, that the attempt to see in the relative position of the hood and the arm of the lever the critical angle described in the patent in suit requires a decided stretch of the imagination. And even granting that it can in fact be made out, it is a mere happen so, of no practical significance.

The Thomson and Rice patent, No. 413,293 (1889), is the first attempt to connect with the high potential mains of a constant potential alternating current circuit, a circuit having electric lamps in series, and to regulate the same by the introduction and withdrawal of a variable reactance. This is admittedly a practical device, and was nine years earlier than the Baker regulator, but it was not introduced commercially until about the same time. The reactance is secured by means of a coil, wound in sections upon a circular core, and is made to vary, according to the resistance in the circuit, by the connecting up or throw-

ing out of the different sectional windings.   To accomplish this varia-
tion automatically, a pivoted switch is provided (Fig. 2), one arm of
which is attached to an armature or core, which, as against the retrac-

tion of a spring, is drawn down into a coil·set in the circuit.   As the
energy of the current flowing through the mains is increased from any
source the core is drawn further into the coil, and, the other arm of the
switch being thereby moved up over the connecting plates, additional
sections of the reactance coil are thrown in, the reactive effect being
increased with each.   It is idle to suggest that there is anything here
in common with the device in suit, except the general idea of reactance
regulation, which it must be admitted was not new with Baker, even
with respect to an alternating current circuit, with either arc or incan-
descent lamps in series, as is thus shown.   But the attempt to find
in the electro-magnet, employed to shift the arm of the pivoted switch,
the movable reactive coil and core of the Baker invention is far fetched.
Granting that, of necessity, there must be some impedance of the cur-
rent by this as well as by the rest of the device, the inventors ascribe
no such function to it, and it is neither so obvious nor so considerable
that others must be assumed to have noticed it and been instructed
thereby.

A third patent to Thomson, No. 516,846 (1894), is also relied upon
with some confidence by the defendants.   This is, in terms, an alter-
nating current regulator for arc lamps in series, but with an induced
current, the regulation being effected through the arrangement of the
opposing coils of the transformer, which operate upon each other
through the medium of the core within the magnetic field of both.   As
one or more lamps are cut out, and thereby a current of less energy is
required, the excess of current thrown back on the secondary coil re-
pels the primary, and so lessens the inductive efficiency of the trans-
former, by air leakage, reducing the strength of the secondary or in-
duced current.   A counterbalancing weight and lever are used, the
same as in the last Thomson, and for the same purpose; that is to

say, as a counterpoise merely, to hinder the downward tendency of the moving part, and not as an efficient mechanical force, opposed to or correlated with the magnetic force operating between the coils. As a variation (Fig. 3), the movable coil is also shown suspended by cords or flexible connections (attached at the other end to retracting springs) over pulleys having eccentric cam extensions. But this arrangement

does not differ in principle or function, being nothing but another form of counterpoise, the cam surfaces being simply for the purpose of securing uniformity of action in the pull of the springs. And although it is declared that the device may be "varied to produce any desirable variation in the pull," this seems to be merely an incidental observation, of no especial significance, it being immediately added that "the action of this form of counterpoise is of course the same." This patent assumes some importance as the substantial basis of the General Electric Constant Current Transformer, to be hereafter more particularly referred to, and it is confirmatory of the view taken with regard to it

that at the outstart there was no provision in these transformers for varying the counterbalancing, which remained constant, that necessity being subsequently recognized and worked out by the company's electrician, Baker in the meantime having solved the problem in his own way.

A further patent to the same inventor (Thomson), No. 516,847, issued the same day as the last (1894), shows an interesting modification of it.

Here the coils are in series with each other and with the lamps, but the regulating reactance is effected in substantially the same way, by the repulsion of the coils from each other, which increases as the resistance at the lamps lessens, their several effect upon the core, which they respectively surround, being thereby increased, introducing a reactive kick or self-induction, which brings the current to its former value. This increase of inductive effect on the core as the coils are separated is due to the fact that each coil is released or freed to a certain extent from the influence of the other. To this the counterbalancing pulleys and weights, the same as in the last patent, are merely incidental helps, and not substantial and effective forces to be reckoned with. It may be noted in passing that this patent is in part the basis of the General Electric Reactive Coil, of which more later.

The Ferranti British patent (1894) also shows a reactance regulating device for an alternating current. It is true that the current after leaving the regulator is rectified or changed to one that is continuous, it not being regarded as feasible at that time to operate arc lamps in series on any other; but that does not affect the character of the apparatus or the principle which is disclosed. Similarly to the Thomson, the regulation (Fig. 7) is effected through a trans-

former, having two movable primary coils, hung vertically with a fixed coil intermediate between them, all of them surrounding a common core. From the points where the movable coils are pivoted extend vertical and horizontal levers, at right angles to each other, at the extremities of which are counterbalance weights of different size. These are so arranged that, as the movable coils are repelled from the fixed coils by the increased force of the current, the weights at the ends of the horizontal arms oppose this, and tend to force them together again; but the weights at the top of the upright arm, being thrown out of the vertical, and gravitating in the other direction, work just to the contrary, the diminished repulsion between the fixed and the movable coils, as they get further apart, being thus met by a graduated decrease in the gravitational force operating to bring them together again. To the extent that a vary-

Fig 1

ing mechanical force is thus made use of, in opposition to a magnetic one, as well as in the way that an equilibrium is sought to be secured between them, by means of levers and weights acting automatically, it may be said that the same elements are here as are found in the patent in suit. But this is true only in the most general sense, and the gap between the two is nevertheless wide. Not only is there a difference in the character of the magnetic force employed, which is itself distinctive, but there is no suggestion how the opposing forces—magnetic and mechanical—are to be adjusted or correlated to produce constant current, without which it can hardly be said to have advanced beyond the theoretical stage.

The Bruger Swiss patent (1894) is of some importance as showing another kind of mechanical force, employed for purposes of regulation, in opposition to a magnetic one. In it an iron core is suspended on a spring above a series coil into which, as the energy of the current is increased, it is drawn by magnetic attraction

against the action of a spring, a counterbalance between the two be-
ing supposed to be secured by the increased resistance as the spring
is extended.   It is to be noted that the magnetic force in this ar-
rangement is not repulsion, but attraction, the same as in the Baker
regulator, and the mechanical force the retractance of a spring.   But
the device is of limited range and purpose, and, as was observed

FIG.2.

with regard to the Ferranti patent, the correlation of the mechan-
ical force with the other elements involved, if it is to be regarded as
at all in the mind of the inventor, is very inadequately and unsatis-
factorily treated.   The mere hanging of a core on a spring to be
drawn down by the magnetic influence of a coil is not enough with-
out more, and it is a question, therefore, whether anything practical
is shown.   Assuming, however, that the special combination which

F IG.3.

there appears would stand in the way of a similar subsequent one,
or even of a construction of the patent in suit which would extend
to a device having these particular features, that is the full extent
to which it goes.   There is certainly nothing in it to anticipate or
limit the invention outside of that.
. The Willans British patent (1883) is a mere sidelight.   Designed
to regulate the speed.of a dynamo engine, its significance consists

simply in disclosing (Fig. 3) the use of a variable counterbalance lever, with bent arm and weight, opposed to the magnetic pull of a coil and core, varying according to the energy of the current, which is one of the details of the present invention, but, of course, falls far short of suggesting it. It was something which the inventor found at hand in the art for such further uses as it might be put to, but that is all.

The Spencer patent, No. 588,610 (1897), is another which is somewhat seriously pressed. This is ostensibly for a special style of arc lamp on an alternating current, supplied with a reactance regulator in series therewith, for the purpose of controlling and steadying the current, and so the luminosity, of the light. To this end there is

FIG. 2.

provided, as it is said, in electric circuit with each lamp a choking coil capable of automatic variation as to its magnetic field, and consequent variation in its self-induction. Suspended within the coil (Fig. 2) is a movable core, having a weighted end, which opposes itself to the upward sucking action of the coil. When the current passing through the coil is normal, the parts are so proportioned that the core is retained at a certain height; but when for any reason the energy of the current is diminished, and therewith the magnetic effect of the coil lessened, the core descends, and thereupon the self-induction of the coil is relieved, giving passage to greater force, and restoring the equilibrium. Here, as it is contended, is a reactance device for the regulation of an alternating current supply, in which a correlation between magnetic pull and mechanical force, the latter being represented by a gravitational weight, is made use of to secure constant current, thus fulfilling the terms of the patent in suit. Too much importance, however, is not to be attached to the general points of resemblance referred to. The whole purpose and design of this device is to overcome the slight variations in the electromotive force at the arc, due to the use of solid instead of cored electrodes in an inclosed lamp, although it must be confessed that its corrective effect of variations in the current supply is also recognized. But it is confined in its range of operation to a single lamp, and there is no attempted variation in consequence of the

mechanical force, such as is necessary to meet changes in the resistance of a circuit composed of many lamps in series, which is the feature of the Baker invention that gives it its distinctive place.

It may be that it was this patent that brought about the disclaimer,[1] entered by the complainants just before bringing suit, by which claims 3 and 5 and a cognate portion of the specifications were eliminated. These claims relate to the regulation of a single arc lamp, in series with the reactance coil; and in view of the terms of the disclaimer, by which it is averred that the patent is too broad, including that of which Baker was not the original inventor, it is contended that this has the effect of making that which is so disclaimed a part of the prior art; from which it is further argued that there was no patentable novelty in extending to a number of lamps that which was admittedly old as applied to one. But nothing of this can be received. The purpose of a disclaimer, after issue, is to take out of a patent that which has been mistakenly or inadvertently included in it, by which it is made too broad. It must be of some distinctive and separable matter, which can be ex-

[1] To the Commissioner of Patents: Your petitioner, Manhattan General Construction Company, a corporation organized and existing under and by virtue of the laws of the state of New York, and having its principal place of business at the city of New York, in said state, respectfully represents:

That it is possessed of the full and entire legal right, title, and interest in and to letters patent No. 684,340, granted October 8, 1901, to it as assignee of Malcolm H. Baker for regulating device for arc lamp circuits;

That it has reason to believe that through inadvertence, accident, or mistake the specification and claim of said letters patent are too broad, including that of which said Baker was not the first inventor.

Your petitioner therefore hereby enters this disclaimer to that part of the specification and claims which is identified as follows, to wit:

The construction illustrated in figure 5 of the drawings and described in the specification and claims in the following words:

"Fig. 5 illustrates diagrammatically my improved regulating coil in connection with a single arc lamp."

"I may apply my regulating reactance-coil to a single lamp structure as well as to a circuit including a series of arc lamps. In Fig. 5 I illustrate such an application. The regulating coil is in this instance placed in series with the carbons—that is to say, it is connected up in the main circuit of the lamp. Its action is precisely the same as has already been described in connection with a series of lamps in circuit."

"3. In an alternating current arc lamp a regulating reactance coil in series with the carbons, the said coil having a moving part adapted, when moved to different positions by the magnetic pull of the coil, to cause varying choking effects in the coil, the moving part being acted upon by a force opposing the magnetic pull, which force is so adjusted throughout its effective range of operation as to balance the magnetic pull when the moving part is in positions adapted to produce constant current."

"5. In an arc lamp, a pair of carbons and a regulating reactance coil in series therewith, the said coil having a moving part adapted to increase the choking effect in the coil, a pivoted lever connected to the moving part and a weight on the lever, the connection between the moving part and the lever being made at a critical angle, whereby the varying effects of the weight and the magnetic pull of the coil cause varying choking effects which are adapted to maintain the current constant."

Dated City of New York, February 11, 1902.

Manhattan General Construction Company,<br>By G. W. Hebard, President.

Attest: W. A. Esselstyn, Secretary.

135 F.—51

cluded without disparagement to that which remains. Hailes v. Albany Stove Co., 123 U. S. 582, 8 Sup. Ct. 262, 31 L. Ed. 284. But the right to disclaim is a beneficial provision, and is entitled to a certain liberality of treatment, and may be made use of to avoid the effect of having embraced more devices than could properly be the subject of one patent (Sessions v. Romadka, 145 U. S. 29, 12 Sup. Ct. 799, 36 L. Ed. 609); or even to remove an ambiguity (Carnegie Steel Co. v. Cambria Iron Co., 185 U. S. 403, 22 Sup. Ct. 698, 46 L. Ed. 968). Matters duly disclaimed thus cease to be a part of the invention, and the patent is to be construed as though they never had been included in it. 22 Am. & Eng. Encycl. Law (2d Ed.) 402; Dunbar v. Meyers, 94 U. S. 187, 24 L. Ed. 34; Schwarzwalder v. New York Filter Co., 66 Fed. 152, 13 C. C. A. 380. In the present instance the complainants merely disclaim that Baker, their assignor, was the original inventor of a regulating reactance device, such as is covered by the patent, as applied to a single arc lamp. That is to say, no claim is laid to this as a part of the invention. There is no admission, however, in this that the subject of the disclaimer appears in the prior art, which may not by any means be the case, nor is there any justification for so construing it. It merely takes out of the patent the excided matter, leaving it as though it had never been there. This does not, of course, prevent that which is disclaimed from being identified with anything to be found in the prior art—such as the Spencer lamp, for instance, in the case in hand —with whatever argument may be legitimately drawn therefrom. But there is no sanction for using the disclaimer as evidence that there is any such device in fact, which is the effect sought to be given it here, as to which it does not undertake to speak.

The most important reference has yet to be considered, and that is the General Electric Constant Current Transformer, to which allusion has already been incidentally made, which was installed at Hartford, Conn., in the early spring of 1898, somewhat less than a year prior to the Baker invention. This was the first successful attempt at complete regulation, and it is to-day, in its perfected form, the only kind outside the Baker which has gone into extensive commercial use. As already stated, it is based on the Thomson patent, No. 516,846, and, as observed in that connection, it was not at first provided with anything to vary the force of the counterweight, a detail which was subsequently worked out, but not till after the Baker regulator had made its appearance. Except in this superadded feature it makes use of no principle which is not to be found in the patent referred to, and as that did not anticipate the Baker neither does it. Granting that both are reactance regulating devices, in which a magnetic force is opposed to a mechanical one, and that the two are so correlated in each as to accomplish a generally similar result, the difference between them is nevertheless marked; being one not simply of mechanical construction, but of mode of operation and of type. In the General Electric Transformer, the main or primary current remaining unchanged, regulation is effected, partially, it is true, by reactance or the choking of the current, through increased self-induction in the transforming coils, but principally by varying the pressure of the induced current through a change in the ratio of transformation, as the primary and secondary coils are

 

repelled from each other under the force of the accumulated voltage. It is to facilitate this result, rather than to secure constancy of current, that the counterbalancing weights, hung upon adjustable eccentric winding surfaces, are employed, the transformer being actually set to give a varying current in the lamp circuit, at different loads, instead of a constant one, increasing or decreasing to meet the changing conditions by the cutting in or out of lamps; while, in the Baker, regulation is accomplished by a direct choking of the current, by means of a reactance interposed in the lamp circuit itself, the whole purpose being to maintain a constant current in the face of a constant potential, all the way from full load to no load, which it effectively does. In matters of detail, also, the two differ materially. In the Baker the choking of the current depends on the relative position of the coil and core, such choking increasing as they are drawn together by the increased magnetic pull produced by the accumulated energy of the current, and decreasing as this is otherwise taken up, and the two are forced apart by the counterbalancing weight; while in the General Electric Transformer the relation between the coils and core does not change, but only that of the coils to each other, the function of the core, which remains equally in the magnetic field of both, being simply to increase their influence upon each other. This influence, moreover, being one of repulsion and not of attraction, requires a delicacy of adjustment, because of its weakness, which is not necessary where the many times stronger force of attraction is employed; and its effective range is correspondingly limited. Where, therefore, the Baker regulator is simple and compact, and, with a marked economy of material, is able to cope with the entire situation from no load to full load, the General Electric Transformer has a tank huge in size, and bursting with mechanism, and still only undertakes to regulate up to 72 per cent. of the number of lamps in circuit. Incidentally also it is to be noted that the variable weight, the original purpose of which was merely to serve as a counterpoise to the coils, is at its maximum effect at full load, where it is at its minimum under the same conditions in the Baker, the two thus working functionally to secure diametrically opposite results. Nor at the outstart

was it a matter of design that, as in the Everest patent, where it is given no function, there should be an upward bend to the arm of the lever which carries the adjustable quadrant or sector, on which in the larger sizes of the transformer the weight is hung, the original purpose of this being so that the sector should avoid striking the tank at its lowest position. Not till afterwards, and after it had been made use of by Baker, was it appreciated that in this form it aided the quadrant in varying the leverage of the weight. Without dwelling further upon the subject, it is thus abundantly established that, as already stated, the General Electric Transformer differs radically from the Baker regulator, however much in a general way, they may seem to proceed along similar lines. The problem presented to each was no doubt the same, but it has been worked out in distinctly different ways; nor is this to be obscured by the fact that magnetic and mechanical forces bearing a resemblance to each other have been made use of and correlated in both, the manner of doing so being by no means the same. Accepting the General Electric Constant Current Transformer as the best product of the prior art, the increased range of effectiveness of the Baker regulator, as well as its simplicity of construction in comparison with the great complexity of the other, is proof of itself of the advance to be found in the latter, even if there were nothing else. Sessions v. Romadka, 145 U. S. 29, 12 Sup. Ct. 799, 36 L. Ed. 609; Hobbs v. Beach, 180 U. S. 383, 21 Sup. Ct. 409, 45 L. Ed. 586; National Brake Beam Co. v. International Brake Beam Co., 106 Fed. 693, 45 C. C. A. 544; Boyer v. Keller Tool Co., 127 Fed. 130, 62 C. C. A. 244.

The General Electric Reactive Coil—based in part on the Thomson patent, No. 516,847, supra, and in part on the Everest patent, No. 710,050—goes one step further, and adopts as the mechanical force employed a counterbalance lever and variable weight, the reactance device being also in series with the lamps. But the latter consists of two oppositely wound coils, set one above the other, surrounding and movable upon a common core, the repulsion between the coils, the same as in the constant current transformer, being the magnetic force made use of, the core being merely an intermediary between them. But even if this device approached more nearly to the Baker than it does, it adds nothing to the case against it, because it clearly is later in date. The earliest form which it assumed was a small apparatus built for the purpose of experiment, in March or April, 1899, which as late as September of the same year, when the paper of Prof. Robb was read and discussed before the American Institute of Electrical Engineers, had not yet been put into what was considered a successful commercial shape. It is a question just when afterwards this was accomplished, but it is not important to decide; for its first beginnings were admittedly prompted by the coming out of the Baker regulator early in 1899, which the engineers of the General Electric Company endeavored to meet with something of a correspondingly inexpensive character. The visit of Mr. Baker to Hartford at the instance of Mr. Westinghouse, at which time it is claimed that he got his ideas, was prior to this, in November or December, 1898. But even though the conceded purpose of this visit was to inspect the plant of the General Electric Company,

and see how to get around their constant current transformer which was there installed and being displayed, the fact remains that he did so, with a device of his own of distinct character, which, as shown by his letter and sketch to Mr. Westinghouse of December 26, 1898, was almost immediately conceived, and was put into commercial shape, substantially as it now appears, about March 1st following. As the General Electric Reactive Coil was subsequent to and consequent upon this, it needs no further notice here.

There can be no question from this review of the prior art as to the entire novelty and validity of the Baker invention. It is true that the whole field was not open to him, but only an as yet unoccupied and somewhat restricted place in it. There were undoubtedly existing devices of kindred and suggestive character; nor can it be contended that reactance regulation, even as applied to an alternating current for arc lamps in series, and on a continuous as well as a transferred current, was altogether new, nor yet the correlation of mechanical and magnetic forces. What was new, however, was the particular forces selected, taken in conjunction with the way in which they were co-ordinated and combined; and especially in the discovery that a varying gravitational or other like mechanical force could be successfully opposed to the magnetic pull, at different positions of the coil and core of the choking device, and the two so adjusted as to afford with exactness the reactance required to meet changes in the resistance in the circuit, and thus maintain the current constant. This had been only partially and cumbrously accomplished by others previously, the efforts of the inventor producing that which not only differed in degree of effectiveness but ir type. To the extent that he has thus brought about that which is novel and useful he is entitled to the protection of the law, and the only remaining question is whether the defendants infringe.

If the fourth claim on which the complainants rest their case is to be taken as it reads, they certainly do. They clearly make use—in an alternating current circuit, in series with translating devices—of a regulating reactance device, consisting of a coil and core, the coil being suspended at the end of a pivoted arm or pendulum in proximity to the core, which is set above and at an angle to it, the two being so located relatively that the one is calculated to be drawn upward upon the other under the influence of magnetic attraction; the coil or moving part being thus adapted, when moved into different positions by the magnetic pull exerted by the varying energy of the electric current passing through it, to cause varying choking effects, and being itself acted upon in turn by the force of gravity, opposed to the magnetic pull, the one being so adjusted throughout its effective range of operations as to counterbalance the other, when the coil, by the greater or less reactance established by its position on the core, is calculated to produce a constancy of current. This which is exactly descriptive of the defendants' device, is at the same time descriptive also of the invention in suit, as expressed in the claim referred to. Aside, however, from any technical adherence to terms, it requires but little observation to perceive that the inherent principle of the invention has been appropriated by the defendants, with only slightly varying features. That the two are

closely allied is established by one of the defendants' own bulletins, where, after speaking of the Constant Current Transformer, it is said:

"There is still another type of regulator which consists of an impedance coil, in which the impedance is varied automatically by changing its relation to an iron core, this impedance being in series with the lamps. This form of regulator has many things to recommend it. * * * It can be used directly upon the primary circuit without any transformation, if so desired, which would give the system a greater efficiency, and it can be made extremely simple in construction. The Helios-Upton Company's Regulator is of the last-named type. It consists simply of two coils, which are supported * * * on a pivot above them, so that they can swing up on an inclined U-shaped iron core. These coils are drawn up by their own attraction to such a point that their impedance always keeps the current constant. This is accomplished largely by the weight of the coil as an opposing force, a small weight being used only for adjustment."

Undoubtedly the invention under discussion is to be regarded as residing in a structure of the same general character as that which is described in the specifications, to which the inventor is to be confined. Diamond Match Co. v. Ruby Match Co. (C. C.) 127 Fed. 341. But even on the basis that, as the result of this, a lever is a necessary component, this is to be found in the defendants' regulator in the rigid arm on which the coil is hung, the weight of which is practically located between the pivot as a fulcrum and the opposing magnetic and mechanical forces by which it is swung up or down. This makes out a lever of the second class, and it is to be noted with regard to it that it is by the operation of the two forces mentioned upon each other, through it as an intermediary, that the changes in the position of the coil, and its consequent varying reactive effect, is brought about, the same as in the invention in suit. This establishes in both form and function the substantial equivalency of the two. It is only as a critical angle in one arm of the lever is made an essential feature that the defendants are able to escape. This, no doubt, is the form to which prominence is given by the inventor in the specifications, but there is nothing there which of necessity restricts him to it. As was observed with regard to the method patent—although the two stand somewhat differently—all that is shown in the specifications may well be taken as illustrative merely, and not as intended to impose a limitation, other than as just indicated.

Indeed, the inventor expressly declares, speaking on the subject of the force to be made use of to oppose and vary with the magnetic pull between coil and core: "I have discovered that such a force can be applied mechanically in several ways." It is true that he goes on to say: "In the present instance I make use of a compensating lever carrying a weight, * * * and I pivot the said lever at such a point as to form a critical angle between * * * the two parts * * * on opposite sides of the pivot;" and then proceeds to describe at length, by words and diagrams, the method for determining it. But he also states later on: "It is immaterial whether the weight 9 [shown in the drawings, hung from the end of the bent arm], or any other counterweight or force, is attached to the coil or the core, the relative movement of these two parts being the feature upon which the choking effect depends;" and further adds: "When the compensating lever is attached to the core of the reactance device instead of to the coil (it being assumed that the coil is arranged above the core), the core itself forms part of the mechanical force opposing the magnetic pull of the coil." It is thus not only shown that he had variations to the extent indicated in mind, but that one of these, in which the weight of the core drawn upward by the magnetic pull of the coil above it is utilized as a part of the counter mechanical force employed, approaches very closely, if it does not in fact cover, the defendants' device. It is in the light of this, as well as the rest of the specifications, that the claims must be read; and, the one under consideration having been formulated by the inventor in broad terms, it is not to be cut down to the particular construction in which the critical angle appears, there being enough in the specifications to support it outside of that, especially, also, as that has been made the subject of a separate claim.[2] National Cash Register Co. v. American Cash Register Co., 53 Fed. 367, 3 C. C. A. 559; Smeeth v. Perkins, 125 Fed. 285, 60 C. C. A. 199; Boyer v. Keller Tool Co., 127 Fed. 130, 62 C. C. A. 244.

It is said, however, that, as shown by the proceedings in the Patent Office, it was only after the amendment of the specifications, by which the method of determining the critical angle was introduced, that the objections of the examiner were removed; and that, having thus been made an element without which the patent would not have been allowed, the invention cannot be carried beyond it. But it is to be observed that while considerable stress was no doubt laid upon this feature in argument there, in response to which the amendment spoken of was introduced, yet this was more for the purpose of making clear the method of fixing the angle on which the inventor relied, which he had referred to as obvious to any one skilled in the art, the examiner evidently not so regarding it. The significant thing is that the claims themselves were not amended to bring in any such limitation, but, after

---

[2] "2. In an electric circuit, a regulating reactance-coil having a moving part adapted to increase the choking effect in the coil, a number of translating devices in series with the coil, a pivoted lever connected to the moving part, and a weight attached to the lever, the connection between the moving part and the lever being made at a critical angle, whereby the varying effects of the weight and the magnetic pull of the coil cause varying choking effects, which are adapted to maintain the current in the circuit constant."

some intermediate changes involving nothing of this character, were accepted substantially as they were proffered, and without this they are to be taken as they read. Acme Flexible Clasp Co. v. Carey Mfg. Co. (C. C.) 96 Fed. 344; Society Anonyme Usine v. Rehfuss (C. C.) 75 Fed. 657; Diamond Drill Co. v. Kelley (C. C.) 120 Fed. 282; Boyer v. Keller Tool Co., 127 Fed. 130, 62 C. C. A. 244. It was recognized, moreover, by the examiner in his final observations on the case, that the real invention resided in the correlation established between the magnetic and mechanical forces employed and the choking effect of the reactance coil, in a way to produce constant current; and that this was not confined to the method by lever and weight, but was broad enough to extend to a device where a spring was used instead, which hardly comports with the idea that it was only accepted in its special and restricted form.

· A point is sought to be made out of the fact, which has already been adverted to, that, while the application was pending for the patent in suit, others were from time to time brought forward covering different forms of similar reactance regulating devices, all being allowed and issued the same day. It is contended that the inventor in this way not only recognized the limited character of the present patent, but himself of necessity set bounds to it, the others being entirely superfluous and redundant if the invention here is of the broad scope claimed. In one of these, the buoyancy of a conical float from which the coil is supended is made use of, the sides of which curve inwardly in the form of a parabola, and are so graduated as to offer rapidly increasing resistance to the magnetic pull, according to the increased displacement of the liquid into which it is drawn. In another, the opposing force is a specially calibrated spring, on which the coil is directly suspended, or which is attached, in place of a weight, to the other end of an evenly pivoted lever. In a third the counterbalancing weight, in the form of a roller, is attached by a link to the end of a similar lever, and is arranged to slide up and down an incline having a so-called critical curve. In a fourth the weight is suspended on a chain or on links, from the end of a lever, varying effect being thereby given to it, as the other arm is lowered or raised. The fifth has a divided weight, the different parts of which are taken up one by one, as the lever is similarly moved. While in the sixth it is suspended on a sprocket chain, stretched over a pivoted lever, one arm of which is given a critical curve, whereby the effect of the weight is increased or lessened as it is moved up or down. I have gone into these structural details for the purpose of giving full force to the argument, but I am not persuaded that it should prevail. These patents undoubtedly represent different developments of the same inventive idea that is the basis of the one in suit. Not only is this attested by their common purpose and character, but they have identically the same introductory specifications, borrowed from that which we have here. They are to be severally confined of course to that which is portrayed and claimed in each, and do not impinge, therefore, upon the present patent any more than they do upon each other. There is no necessity and no pretense, as seems to be assumed, of so broadening it that they will do so. Confining it, as we admittedly must, to a structure of the same general character as is described and sustained by the

specifications, the defendants, for the reasons already given, are nevertheless found within it, and therefore infringe.

Let a decree be drawn in favor of the complainants in accordance with the views expressed in this opinion, and referring the case to a master to take an account.